## FULLER v. NEW YORK LIFE INS. CO.

(Circuit Court of Appeals, Third Circuit. October 29, 1912.)

### No. 1,617.

1. DEATH (§ 2*)—PROOF OF DEATH—PRESUMPTION FROM UNEXPLAINED AB-
SENCE.

   The presumption of death from the unexplained absence of a person for more than seven years is a rule of law, but the presumption is not conclusive, and the ultimate question is one for the jury, where a jury is trier of the facts. One relying on such unexplained absence must prove it, and must prove more than the mere fact of absence. He must also produce evidence to justify the inference that death is the probable reason why nothing is known of the missing person, and many facts are relevant to such inquiry, from all of which the jury must draw the inferences, both intermediate and final.

   [Ed. Note.—For other cases, see Death, Cent. Dig. §§ 1-3; Dec. Dig. § 2.*]

2. TRIAL (§ 193*)—INSTRUCTIONS—PROVINCE OF COURT AND JURY—COMMENTS
BY JUDGE ON EVIDENCE.

   While the judge of a federal court, in charging a jury, may properly comment on the evidence, and may express his opinion freely thereon, the qualification must always be borne in mind that the jury must be left free to determine ultimately all disputed facts and all relevant inferences to be drawn from a fact.

   [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 436-438; Dec. Dig. § 193.*]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action at law by Roberta I. Fuller against the New York Life Insurance Company. Judgment for defendant, and plaintiff brings error. Reversed.

S. S. Mehard and W. C. Dicken, both of Pittsburgh, Pa., for plaintiff in error.

W. W. Smith, of Pittsburgh, Pa., James H. McIntosh, of New York City, and Gordon & Smith, of Pittsburgh, Pa., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. The beneficiary in a life insurance policy brought this action, but offered no direct evidence of death, relying on the presumption arising from the insured's absence, unheard of, during more than seven years.

[1] In discussing the presumption of death from an unexplained absence during seven years, Prof. Thayer, in his Preliminary Treatise on Evidence (page 319 et seq.), shows clearly that it is, and always has been, a rule of reasoning. Early in its development the jury were advised to follow it, because it probably accorded with the fact. Later, as experience showed its usefulness and strengthened its probability, they were given positive directions to follow it, and it thus became what is often spoken of as a legal presumption or a rule of law. Either phrase is convenient enough, if care be taken to keep in mind that the presumption has never been conclusive or irrebuttable. It is a rule of reasoning, a short cut between evidence and conclusion, although it is now a rule that should be followed by whatever tribunal is obliged to pass upon the facts of a particular absence. The stress is to be put on the word "unexplained." This has become the important question, and it is always a question of fact. What weight is to be given to all the circumstances that attend a particular absence? And, as the final result of the inquiry, should death be inferred? Many circumstances may need consideration; but they must all be submitted to a jury, when that tribunal is the trier of the facts. Cases that disclose a chancellor's opinion concerning the weight of the explanatory evidence only show us how he reasoned upon the evidence that was then before him. They do not furnish a rule that is obligatory upon a jury, or upon another chancellor, in reasoning upon different, or even upon somewhat similar, evidence. He who relies upon an unexplained absence during seven years must prove it, and he must prove more than the mere fact of absence during that period. He must also produce evidence to justify the inference that death is the probable reason why nothing is known about the missing person. In the ordinary trial at law a jury must draw the inferences, both intermediate and final; and it will rarely, if ever, be the case that the facts concerning one absence will so closely resemble the facts concerning another that inferences drawn in the first inquiry will furnish a binding rule for the second. If a dispute exists about any of the facts, the jury must first determine it, and they are then to draw from the facts thus ascertained whatever inferences may be proper. Even if the facts are undisputed, it is the jury that must draw the inferences, save perhaps in exceptional cases. In this class of controversies many questions arise that are peculiarly for that tribunal.

For example: What motive sent the missing person away, or prolonged his absence? What were his domestic relations? Where would he be likely to return? Has he been seen, or heard of? With whom would he probably communicate? How extensive and how careful was the search? What were his habits? Do any facts or circumstances suggest violence or accident? And many other questions might easily be added to the list, the important point being that the answers are relevant, if they throw light on his absence or his silence. They are all matters of fact to be weighed and appraised by the tribunal to whom the inquiry is committed. The general subject is well understood, and it will be sufficient to refer to two recent collections of illustrative cases—one in the note to Modern Woodmen v. Gerdom, 2 L. R. A. (N. S.) 809, and the other in vol. 13 of Cyc. Law & Proc. p. 297 et seq. We may also refer to 2 Greenl. Ev. (Lewis) § 278, f, and 4 Wig. Ev. § 2531.

In the pending controversy, the following facts are apparently not denied: In January, 1885, Ira and Roberta Fuller were married, probably in Brookville, a town in the western part of Pennsylvania. They moved to Dayton, Ohio, before September, 1887, and in that month he insured his life in her favor by a 20-year tontine dividend policy. A year or two afterwards they returned to Pennsylvania, living first in Allegheny, and afterwards in New Kensington, Westmoreland county, a small town, where they kept house and boarded from 1891 until February 21, 1900. A daughter was born in 1888. In the afternoon of February 21st, Fuller went away, telling his wife that he was going by train to Greensburg, a town in the same county, and would be home the next day in time to go with her to the theater. Tickets for the entertainment had been bought and were in her possession. On the train he repeated to a friend that he was going to Greensburg. Whether he did or did not go does not appear; but on the afternoon of the 22d he met another friend at a hotel in Pittsburgh, and said that he was going home. Since that time, so far as we know, he has not been seen or heard of. His wife made immediate efforts to learn what had become of him. She employed a detective agency, who pursued the inquiry for six months; and she asked the local lodges of the Elks and the Masons to help in finding him, hoping that their facilities throughout the country for obtaining information about a missing member might be of service. Nothing came of these efforts, or of some inquiries made by two other persons. He had been prominent in the business and social life of the town. At one time he had been a justice of the peace, and on the date referred to his business was real estate and insurance. He was also borough treasurer, and his official bond had been signed by 15 sureties. It was soon discovered that he had embezzled from $4,000 to $6,000 of the borough funds; but no proceedings were taken against him, and his bondsmen paid the money. The community seems to have regarded him with a friendly feeling, even after his defalcation became known. His appearance was likely to arrest attention; his height being more than 6 feet, and his weight 250 pounds. He was of social disposition and agreeable manners. So far as ap-

pears, his relations with his wife and daughter were normal and satisfactory. Apparently he was a kind and loving husband and father.

After he disappeared the plaintiff's own exertions were the sole reliance of herself and her child. She moved to Pittsburgh in April, and began to solicit life insurance, attaining a position of some importance and responsibility in the Reliance Company. She was advised to apply for a divorce, in order to gain a more advantageous status as an unmarried woman, and in April, 1903, she obtained a decree on the ground of desertion. Service of process was made by publication. She kept the insurance alive by borrowing the premiums from the company (except, perhaps, for one year) on the security of lien notes charged against the policy. The company was promptly informed of the disappearance and the defalcation. In the spring of 1907 the plaintiff applied to the orphans' court of Westmoreland county for letters of administration, basing the application on the Pennsylvania act of 1885 (P. L. 155). The object of this statute appears in its title:

"Relating to the grant of letters of administration upon the estates of persons presumed to be dead, by reason of long absence from their former domicile."

Section 1 explains "long absence" to mean "seven or more years from the place of his last domicile within this commonwealth"; and section 2 requires legal proof to establish the presumption of death. On July 31, 1907, a decree was entered granting letters to her nominee on the ground that the presumption of death had been established. In May, 1910, the plaintiff and her daughter removed to California, and at the time of the·trial they resided in Los Angeles. When the insured disappeared, his father, brother, and sister may have been living. On this point the evidence is not clear, especially about the father's life. The plaintiff did not try to communicate with these relatives of her husband, testifying that she had not seen the brother and the sister for years, and did not know where they were, and also that she did not know definitely whether the father, who was a very old man, was still residing in Brookville, his former residence. For 25 years, she said, she had not seen any of them. It did not appear whether the defendant had made search or inquiry for the insured.

[2] The case was submitted to the jury and a verdict was rendered for the defendant. Of the numerous assignments of error, a few are to rulings upon testimony; but most of them are to the charge. We shall not consider them all, for we are constrained to believe that material error exists in several particulars. We do not question the valuable and well-established rule that the trial judge in a federal court may comment upon the evidence, and may express his opinion freely thereon. Authorities upon this subject are scarcely needed; but we may refer to the recent decision of this court in Pittsburgh Railway Co. v. Bloomer, 146 Fed. 720, 77 C. C. A. 146, to show our adherence to the federal practice. But the cases agree that one qualification must always be borne in mind: All disputed facts must ultimately be submitted to the determination of the jury. If

a dispute exists concerning a fact, or a relevant inference from a fact, the judge must leave the jury free. He may not himself decide the dispute or draw the inference. If he does, and if this action is prejudicial, he falls into such error as requires the judgment to be set aside. And this, we cannot avoid believing, is what happened in several particulars at the trial of this case. Except in a single clause, the learned judge nowhere in the charge gave the jury to understand that his opinion on the value of the evidence did not bind them, and that they were free to find the facts for themselves. Speaking of the embezzlement, he said:

"I think that that was an excuse, perhaps—well, I shall change that—not an excuse for his leaving, because a man who is in default ought to face the trouble; but that fact, I think (and yet it is for you, no matter what I think), accounts for his failure to return."

Nowhere else, save in this parenthetical expression, is there any instruction to the jury concerning the effect of his expressions of opinion, and, while a definite instruction on this subject may not be always essential, its absence made more emphatic several parts of the charge in which we think the learned judge, probably by inadvertence, drew inferences himself that the jury alone should have been allowed to draw.

For example (eighth assignment), they were told that the insured's embezzlement was an excuse—that is, an explanation—for his absence, and that this excuse was presented by the plaintiff herself in the record and in the testimony. No doubt his embezzlement was a pertinent and important fact, but it was only one fact among others, and with these its effect was for the jury. In two places (ninth and fourteenth assignments) the charge necessarily implied Fuller's knowledge that his wife had obtained a divorce on the ground of willful and malicious desertion, although there was no direct evidence concerning his knowledge, and the indirect evidence (if any existed) was for the jury. It was also said (thirteenth assignment):

"I say to you that the plaintiff, it seems to me, in order to have fulfilled her duty in the ascertainment of whether or not anything had been heard from this absent husband, from whom she procured the divorce, should have made some inquiry of his relatives, or made inquiry or produced the evidence of the daughter that she had never in the slightest way heard from him."

The plaintiff had testified concerning the reasons why she had not communicated with her husband's relatives; but these reasons are not referred to in the charge, although the fact of her failure to communicate should have been considered in connection with her explanation thereof, and, moreover, was a matter for the jury, and not for the court.

Further (fifteenth and sixteenth assignments) it is said:

"It seems to me that the plaintiff has furnished a reason for the insured's absence from her, and it seems to me that there is a reason furnished by the evidence for the insured's absence from New Kensington, where he last resided according to the evidence; but there is no evidence in this case from which you could warrant that he had not been with his father, or with his daughter, or with his sister, or with his brother, during this period, unless it

be evidence of the advertising that was had in Westmoreland county and in one of the Pittsburgh papers, at the time of the divorce and at the time when they had proceedings to have him declared dead."

After hearing so positive an instruction from the judge, the jury could scarcely avoid the conclusion that there was little, if anything, left of the plaintiff's case. In effect, it withdrew the controversy from their consideration. The plaintiff could not recover, if she had failed to prove his absence from these relatives during the whole of the seven years.

Only one other matter calls for attention. The daughter was not in attendance at the trial. To explain her absence, counsel offered to prove the condition of her health, saying that he wished to learn "whether she is in physical condition to be here just at this time." This offer was immediately overruled on the ground, as stated by the court:

"What difference does that make? Her deposition might have been taken."

It would, we think, have been more prudent to wait for light on this subject; for the record does not show that any evidence had yet been given on the subject of her health. But the ruling might have been harmless, if the jury had not been instructed at the end of the charge that:

"There is no evidence that he had not been secretly communicating with the daughter, who was 23 years of age, and without the knowledge of her mother."

This instruction is covered by the sixth exception, on page 141 of the record, and is the subject of the nineteenth assignment. It criticised the plaintiff for failing to prove a fact by the only witness that could prove it, although permission to explain the absence of that witness had been refused.. After the previous ruling, we think such an instruction could hardly fail to be prejudicial.

The other assignments of error need not be discussed, although we may be permitted to say that it might have been better to omit that portion of the charge quoted in the seventeenth assignment. Fuller's rights, in the event of his reappearance, were not involved in the suit.

The judgment is reversed, at the costs of the defendant in error, and the case is remanded for another trial.