## MODERN WOODMEN OF AMERICA v. MICHELIN.

No. 12844—Opinion Filed March 25, 1924.

(Syllabus.)

1. Insurance — Proof of Death — Presumption from Seven Years' Absence.

In this case, the beneficiary in a policy of life insurance brought suit against the insurer, and for proof of the death of the insured relied upon evidence showing that the insured had been missing for a period of seven years and through due inquiry could not be located. The instruction given by the court correctly states the law and reads as follows:

"You are instructed, gentlemen of the jury, that it is a rule of common law that a person shown not to have been heard of for seven years by those, if any, who, if he had been living, would naturally have heard of him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death: and in this connection you are instructed that there must also be evidence of diligent inquiry at the place of the person's last residence in this country and among his relatives and any others who would probably have heard of him if living; and if you find from the evidence in this case that the plaintiff has made diligent inquiry in an effort to locate S. E. J. M., and further find that he had not been heard of within seven years from January 10, 1910, and prior to the filing of this petition herein, then and in that event your verdict should be for the plaintiff for the amount sued for."

2. Appeal and Error — Questions of Fact— Conclusiveness of Verdict — Proof of Death of Insured.

In a case where the plaintiff alleges the death of the insured in a policy of life insurance and for proof thereof relies upon ev-

idence showing such insured to have been missing for a period of seven years, it is necessary that the plaintiff show that inquiry concerning the insured has been made in all those places where information is likely to be obtained and of all those persons who in the ordinary course of events would be likely to receive tidings of the party being alive, whether members of his family or not, and generally the inquiry should exhaust all reasonable patent sources of information which the circumstances of the case suggest, but such places, persons, and sources of information are only those which a reasonably prudent person under the same or similar circumstances would deem to be sufficient under the terms of the rule as here stated. Under proper instruction the sufficiency of the search and inquiry is one for the jury, and the jury's determination that same was sufficient will not be disturbed by this court upon appeal, unless by an examination and consideration of all the evidence in the record, we can say, as a matter of law, that the minds of all reasonable men should concur in holding same insufficient under the rule announced.

### 3. Appeal and Error — Conclusiveness of Verdict—Rule Stated.

This court has sometimes said that on appeal it will not disturb the verdict of the jury if there is any evidence tending to support the verdict, but that expression must not be given too literal, technical, and strict an interpretation, else it may be given a construction that will be an erroneous statement of the law. In order for the verdict of a jury to stand, there must be in the record such competent evidence that if uncontradicted and unimpeached, will constitute prima facie proof of every fact essential as a matter of law to the establishment of the cause of action or defense upon which the verdict is based.

### 4. Insurance—Presumption of Death from Long Absence—By-Law Abrogating Rule of Evidence—Invalidity.

"Courts will not permit the course of justice upon trials before them to be stipulated or contracted in such manner as to defeat the ends to be subserved by such trials. The parties to the contract cannot agree to oust the courts of jurisdiction over such contract. The operation of this clause, requiring direct and positive proof, in many cases would, in effect, preclude the court from jurisdiction and bar a recovery. If they can make this agreement, they can also stipulate that the evidence must come from certain persons, or make any agreement they see fit, controlling and directing the course of proceedings upon the trial. They may contract in relation to a condition precedent before bringing suit, or in relation to anything going to the remedy, but not to the right of recovery itself." Utter v. Insurance

Company, 65 Mich. 545, 32 N. W. 812, 8 Am. St. Rep. 913.

### 5. Same.

That under certain circumstances, a man is presumed to be dead after seven years' absence, is a well-recognized rule of evidence in force in this state. It cannot be abrogated by contract. The provision in the policy of life insurance or in the by-laws of the corporation that said rule shall not be applicable or available in proof of death of the insured as a basis for recovery under said policy is contrary to public policy and void.

### 6. Same.

In this case, the insurer issued and delivered its benefit certificate to the insured and thereafter adopted a by-law, which, according to the terms of the policy, was binding upon the insured, and reads as follows:

"The disappearance or long continued absence of any member unheard of, shall not be regarded as evidence of death or give any right to recover on any benefit certificate heretofore or hereafter issued by the Society until the full term of the member's expectancy of life, according to the National Fraternal Congress Table of Mortality, has expired within the life of the benefit certificate in question, and this law shall be in full force and effect, any statute of any state or county or rule of common law of any state or county to the contrary notwithstanding."

We hold that such by-law is contrary to public policy and absolutely void

Error from District Court, Tulsa County; Albert C. Hunt, Judge.

Action by Marie L. Michelin against Modern Woodmen of America. Judgment for plaintiff, and defendant brings error. Affirmed.

Truman Plantz, Geo. G. Perrin, and Geo. L. Bowman, for plaintiff in error.

Poe & Lundy, J. E. Curran, and R. E. Morgan, for defendant in error.

LYDICK, J. On January 29, 1903, the Modern Woodmen of America, as insurer, issued, and on February 5, 1903, delivered to Solomon E. J. Michelin, as insured, its benefit certificate, by the terms of which it promised to pay the insured mother, Marie L. Michelin, as beneficiary, upon the death of the insured, the sum of $1,000. Alleging the death of the insured, the beneficiary brought this suit in the district court of Tulsa county against the insurer and sought and obtained judgment thereon. The insurer brings the case here on appeal.

The plaintiff in her petition alleged that the insured had been absent and missing for a period of seven years, and that by diligent search and inquiry she was unable to learn of his being alive during that seven-

year period, and for said reasons she therefore alleged that the insured was dead. Under a general denial contained in its answer, the company urged that the insured was seen alive during that seven-year period of time. The insurer denied that plaintiff had made inquiry concerning the insured sufficient to satisfy the rule of evidence on which the plaintiff relied in support of such proof of insured's death. Distinctly separate from this defense, the company pleaded that this rule of evidence had been abrogated in this case by a by-law of its own making, wherein it is recited:

"The disappearance or long continued absence of any member unheard of, shall not be regarded as evidence of death or give any right to recover on any benefit certificate heretofore or hereafter issued by the Society until the full term of the member's expectancy of life, according to the National Fraternal Congress Table of Mortality, has expired within the life of the benefit certificate in question, and this law shall be in full force and effect, any statute of any state or country or rule of common law of any state or country to the contrary notwithstanding."

This by-law was adopted by the company long after this benefit certificate was issued, but in the lengthy printed benefit certificate it is provided that the insured shall be bound by-laws thereafter adopted.

For a further defense the company pleaded that the benefit certificate was executed and delivered in Kansas, and was therefore a Kansas contract, to the interpretation and enforcement of which must be applied the laws of the state of Kansas, under which, so the company pleaded, the action was barred by the statute of limitations at the time it was instituted. This defense was later abandoned.

The material facts in support of the plaintiff's allegation of the insured's absence for seven years and of the inquiry which was made concerning him are about as follows, to wit: Marie L. Michelin and her husband, the parents of the insured, lived for 23 years at Madison, Kan., and on November 24, 1907, the family moved to Grannis, Ark., and established a home. The family then consisted of the parents, and the insured, and of one brother and one sister. In August, 1909, the insured was 25 years of age, unmarried and living with his parents at the family home. He had then held the benefit certificate sued on in this case for nearly seven years and same was in full force and effect. He left home without declaring just where he was going. He was a carpenter by trade and had spent a part of his time in the organization of lodges for the Woodmen of the World. In January, 1910, his father received a postal card from the insured, on which the insured had written these words: "Jan. 10, 1910. Will write soon, all O. K. Sol." The postal card was mailed in the Republic of Mexico. A photographic copy of same is set out in the record, but we are unable to learn therefrom the post office in the Republic of Mexico where the same was mailed. On the back of the card appears a picture of a public building, designated as being Juarez. The card was addressed to the insured's father and received by him shortly after its date. A young lady in the little town of Grannis received a card on which was written the same word, mailed at the same time as the other card. The insured was engaged to marry this young lady when he went away, but on account of her youthfulness, he agreed he would return in two years and marry her. The following December the father died, and a few months later the daughter died, leaving and surviving at the home in Grannis only the mother and the other son. Except for a short time spent in Boynton, Okla., the family and its survivors continued to live in Grannis, Ark., until 1920, when the widow and the remaining son moved to Ardmore. The town of Grannis is a small village of two or three hundred inhabitants and the family was well acquainted and well known throughout the neighborhood. Receiving no further word from the son after the receipt of the postal card referred to, the mother began making inquiry when the father died, in an effort to locate this son. She wrote a friend of her son at Kansas City, Mo., with whom her son had been corresponding when he went away, but he had no word from the insured. She made inquiry from the young lady to whom the insured was engaged. The other son consulted a clairvoyant, who told him the insured was located in Bismark, N. D. She made it known throughout the neighborhood that she was endeavoring to locate the son. Apparently believing that the fraternal love existing between the members of the Modern Woodmen of the World would impel the company's head officers to aid the widowed mother in search for this missing or deceased brother in the order, she called upon the local clerk of the order at their former home in Madison, Kan., where the benefit certificate was issued, but he had no information concerning the son. This clerk referred the mother to the head clerk of the order at Rock Island, Ill., but he too refused to aid her in the search, but referred her to the general attorney of the order, who also declined to extend his aid. These officers were informed of the existence of the benefit certificate and the result of the mother's investigation and the facts generally.

The investigation by the family continued, and the mother testified:

"Well, I wrote to Kansas City, and of course inquired from every one whom I thought would know anything about him at the time of his father's death."

The other son, brother of the insured, testified and closely corroborated the mother's story, and, among other things, said:

"Well, I have tried every way in the world that I could, just as far as writing is concerned. We have never advertised in any way in the world, except mamma, she wrote every place she figured there was a chance to find somebody knowing something about him."

The family relations with insured had always been friendly, and, except for a few months, the insured had lived at home with the mother until the time when he left home as stated. Neither the mother nor the son had ever heard that anyone claimed to have seen the insured during that seven-year period of time, except that after this suit was instituted this remaining son heard of assertions made to that effect by the two witnesses whom the company produced at the trial. The mother and son testified that insured had never had any difficulty or trouble, except that three years before he left home he was arrested before a justice of the peace for running a fortune wheel at a picnic, but the case had been dismissed long before the insured went away.

The company produced two witnesses from Grannis, Ark., who testified that they had seen the insured on the train near Grannis in the spring of 1914. Some very indefinite evidence was produced tending to show that at some uncertain time before the insured went away, he was threatened with some trouble about a $5 check he had given when he had only $4.50 in the bank, and a little trouble was threatened about not paying for a watch he had bought, but which bill the mother said he did pay. We have carefully read all the testimony of these two witnesses, who claimed they had seen the insured in 1914, and we have given particular attention to the pages of a diary which one of them produced in evidence, where it is noted that he had seen the insured on a certain date. Apparently the jury declined to believe these witnesses.

The company complains here because of the admitted failure of the mother in three respects, to wit:

"First. That she did not inquire concerning her son in the Republic of Mexico, from which place the postal card was mailed.

"Second. She did not advertise in the press.

"Third. She did not notify the police authorities."

The assignments of error here presented may be determined by proper disposition of the following propositions:

First. Does the evidence show that sufficient search was made for the insured to establish his death under the rule relating to seven years' absence?

Second. Is the company's by-law abrogating the application of this rule of evidence relating to the effect of seven years' absence a valid by-law and this rule of evidence therefore inapplicable to this case?

Addressing ourselves to the first proposition, we desire to determine the exact provisions of this particular rule of evidence. In Jones on Evidence, vol. 1, page 302, paragraph 57, it is said:

"Presumptions of death after seven years' absence—Origin, of presumption. ' * * Like all other rules, it took its shape from necessity—the necessity of settling property rights and very often status. As the courts had to resort to the presumption of the continuance of life, in the absence of direct proof of life or death, in order to settle important rights which were often involved, it became equally necessary to adopt some counter-presumption in classes of cases where the death of the person would in the ordinary course of events seem more probable than the continuance of life. Accordingly, in analogy to certain English statutes, the courts adopted the rule that 'a person, shown not to have been heard of for seven years by those (if any) who, if he had been alive, would naturally have heard of him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death.' Thayer, in his usual thorough way, gives an interesting and instructive account of the presumption, and fixes its application in its present form as of 1805, and that it appeared for the first time in the text-books in 1815 and was speedily followed by other eminent writers, ending in 1876 with Stephen. 'Here, then,' says Thayer, 'in seventy years we find the rule about a seven years' absence (1) coming into existence in the form of a judicial declaration about what may or may not fairly be inferred by a jury in the exercise of their logical faculty; the particular period being fixed by reference to two legislative determinations, in specific cases of a like question; (2) passing into the form of an affirmative rule of law requiring that death be assuumed under the given circumstances. This is a process of judicial legislation, advancing from what is a mere recognition of a legitimate step in legal reasoning to a declaration of the legal effects of certain facts.'"

"Same—American development of the presumption.—In this country the rule has generally been appled only to those who were absentees from their home; and it is thus stated in a Massachusetts case: 'If a man leaves his home and goes into parts unknown and remains unheard from for the space of seven years, the law authorizes, to those that remain, the presumption of fact that he is dead: but it does not authorize him to presume, therefore, that any one of those remaining in the place which he left has died.' It is not necessary, in order to raise this presumption, that the removal should be beyond the seas or even to a distant state; but if one removes from his state to a fixed place of residence in another state, the fact that he has remained unheard of in the former state does not alone authorize the presumption. It need hardly be added that this is not a conclusive presumption. It is one of fact and is subject to be controlled by the facts of the case. It is one which varies in weight according to the circumstances. The presumption under discussion is an arbitrary one, rendered necessary on grounds of public policy in order that rights depending on the life or death of persons long absent and unheard of might be settled by some certain rule. It is not enough to raise the presumption that the person has not been heard from for seven years. It is not only necessary to show this, but also to show his absence from home and that inquiry has been made at the place of residence of such person abroad, if he had any known fixed reidence. And this is so even though such residence is beyond the seas; but no inquiry need be made at places merely visited."

The Supreme Court of Iowa, in the case of Haines v. Modern Woodmen of America, 178 N. W. 1010, said:

"It is first argued for the appellant that the presumption of death from disappearance and continued absence of seven years does not arise, unless it be further shown that the missing person had been diligently sought and inquired after without avail, and that there is in this case a failure of such proof. There is considerable variance in the views of the courts upon this feature of the rule. By some the idea expressed by appellant's counsel is approved, and the party relying upon the presumption must show a high degree of diligence in making inquiry and search. By others it is distinctly held that proof of disappearance and continuued unexplained absence for seven years, with-. out being heard from by those with whom, in the natural course of things, the person would be likely to communicate, is all that is necessary, and that the presumption is not rebutted or overcome by a failure to show specific acts of search or inquiry. Miller v. Sovereign Camp, 140 Wis. 505, 122 N. W. 1126, 28 L. R. A. (N. S.) 178, 133 Am. St. Rep. 1095; Page v. Woodman, 162 Wis. 259,

156 N. W. 187, L. R. A. 1916 F, 438, Ann. Cas. 1918D, 756.

"In none of our cases have we gone to either extreme. We have said that—

"'When (the absence) is shown to have continued for seven years, * * * unaccompanied by circumstances which reasonably account for his disappearance on a theory not involving his death, it becomes sufficiently strong to cast the burden of rebutting it upon the party asserting a continuance of life. * * * Slight evidence may sometimes be sufficient to rebut the presumption of death; but ordinarily it is a question for the triers of fact to determine whether the presumption shall prevail. In short, the circumstances both for and against the theory are to be taken into consideration, and therefrom the truth arrived at as nearly as may be possible under the established rules of law governing the adjudication of disputed facts." Magness v. Woodmen, 146 Iowa, 5, 123 N. W. 171. Such is also the effect of our recent decision in Richey v. Woodman, 184 Iowa, 10, 16A8 N. W. 276, L. R. A. 1918F, 1116. And see Kennedy v. Woodmen, 243 Ill. 560, 90 N. E. 1084, 28 L. R. A. (N. S.) 181."

In the case of Modern Woodmen of America v. Ghormley, 41 Okla. 532, 139 Pac. 306, this court had before it a different phase of the same subject-matter. There the question was whether there was still living a certain brother of the insured, it being admitted that the insured was dead. The insured and his younger brother, when boys, were living in Kentucky, when the insured went away to Texas and afterwards died. The interested parties in their efforts to prove that the younger brother who had been left in Kentucky should be presumed to be dead, attempted to invoke the rule which we are discussing, but same was not applicable thereto. This court quoted from Chamberlayne's Modern Law of Evidence, sec. 1096, as follows:

"The presumption of death being based upon an inference of fact that the persons will naturally communicate with their homes, it may be premised that in certain contingencies, where these facts are not shown to exist, the rule of law does not come into operation; for example, it is of no special significance that one who has left home, and is of parts unknown, has failed to hear from or about those whom he has left there."

The rule we here consider was inapplicable to that case, but this court, rather in the nature of dictum, said in sections two and three of the syllabus:

"In order that the presumption that a person once shown to have been alive continues to live may be overcome by the presumption of death, arising from seven years'

unexplained absence from home or place of residence there must be a lack of information concerning the absentee on the part of those likely to hear from him, after diligent inquiry.

"The inquiry should extend to all those places where information is likely to be obtained, and to all those persons who in the ordinary course of events would be likely to receive tidings if the party were alive, whether members of his family or not; and, in general, the inquiry should exhaust all patent sources of information. and all others which the circumstances of the case suggest."

It is argued that this rule was adopted in the early days when travel was dangerous and means of communication most primitive and that the rule has no place under modern conditions. The existence of the rule is admitted and we are without right to repeal it. These suggestions are without argumentative force here, because the missing man was last located in the Republic of Mexico, on the eve of a revolution that spread over its domain famine, disease, and death.

Authorities are numerous and conflicting. We approve the rules laid down in the text and decisions of the Supreme Court of Iowa. In our opinion, the party upon whom devolves the duty to make inquiry concerning the missing one is required to make only such search and inquiry at such places and sources of information and from such persons as a reasonably prudent person under the same or similar circumstances would deem to be sufficient under the terms of the rule as stated. Under proper instructions, the sufficiency of the search and inquiry is one for the jury, upon consideration of the evidence, and the jury's determination that same was sufficient will not be disturbed by this court on appeal, unless, from an examination and consideration of all the evidence in the record, we can say, as a matter of law, that the minds of all reasonable men should concur in holding same insufficient under the rule announced.

Upon this point the court gave an instruction which we think states the law ably and well. Same reads as follows:

"You are instructed, gentlemen of the jury, that it is a rule of common law that a person shown not to have been heard of for seven years by those, if any, who, if he had been living would naturally have heard of him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death; and in this connection you are instructed that there must also be evidence of diligent inquiry at the place of the person's last residence in this country and among his relatives and any others who would probably have heard of him if living; and if you find from the evidence in this case that the plaintiff has made diligent inquiry in an effort to locate Solomon E. J. Michelin. and further find that he had not been heard of within seven years from January 10, 1910, and prior to the filing of this petition herein, then. and in that event your verdict should be for the plaintiff for the amount sued for."

Measured by this rule, is the evidence in the case  sufficient to support a verdict of the jury? The Supreme Court of Illinois, in the case of Kennedy v. Modern Woodmen of America, 90 N. E. 1084, said in section 4 of the syllabus:

"A jury need not accept the testimony of a witness merely because there is no direct testimony contradicting it, where it contains such inherent improbabilities as satisfies them of its falsity."

That was a case involving the same rule of evidence here being considered, and the testimony which the jury had evidently rejected was very similar to the testimony of the two witnesses produced by the company in this case, in which they testified they had seen the insured alive during the seven-year period. We believe that under this rule the jury was within its legal right in rejecting the testimony of the witness who claimed to have seen the insured alive during the seven-year period.

Should the mother have made more diligent search for her son? The result in this case is only mercenary and it is worth the same number of dollars to the company as to the plaintff that the insured be located. With knowledge of all facts which the mother had and knowing this suit was to be filed, the company refused to make search. In its reply brief, and as reason for not making search, the company says:

"We have located the insured in numerous cases such as this. but can no longer attempt to do so, and did not make such attempt in this case, because the cost is prohibitive when entrusted to agencies which specialize in such work."

Perhaps the jury believed the company's reason for not extending the search was good and believed it was equally good for the mother's failure so to do. She might have written a letter to Juarez, in the Republic of Mexico, from whence her son's postal card came, and so the company might have done. It does not appear that the son had even intended to make that place a domicile or that he did so. From the evidence we can say no more than that he incidentally stopped there for a day in his travels. Under the rule laid down by Jones on Evidence, heretofore quoted, she was un-

der no obligation, as a matter of law, to address him there, and the company, having an equal financial interest in his discovery, apparently thought it not necessary to address an inquiry to that revolutionary and war-ridden community. The mother did not notify the police authorities. Why should she have done so? He was not wanted by them, and they were under no duty at their own expense to endeavor to locate this son in a foreign country or elsewhere. The company argues in its brief that much expense in such case is ill advised, the jury perhaps thought that under the rule requiring diligent search, the taking of this step was not necessary. It is true that the company is under no legal obligation to make any inquiry or search for this son and the sole duty in that respect was upon the mother. Being equally interested in the discovery of the son and knowing all the facts, the company's failure to do any of these three additional things which they suggested the mother should have done, at least tends to detract from the appearance of good faith on the part of the company in complaining that the mother did not do so. The company presents a battle front more technical than substantial.

This court has sometimes said that on appeal it will not disturb the verdict of the jury, if there is any evidence tending to support the verdict, but that expression must not be given too literal, technical, and strict an interpretation, else it may be given a construction that will be an erroneous statement of the law. In order for the verdict of a jury to stand, there must be in the record such competent evidence that if uncontradicted and unimpeached will constitute prima facie proof of every fact essential as a matter of law to the establishment of the cause of action or defense upon which the verdict is based.

Under the rules herein announced concerning the presumption of death and the sufficiency of the evidence, we are of the opinion that the evidence in this case is sufficient to support a verdict of the jury to the effect that the insured was dead prior to the time of making the proofs of death and the institution of this suit.

It remains for us to determine the validity of the company's by-law abrogating the rule as to the presumption of death. Apparently such abrogation of this rule by contract is a very modern invention, but authorities are not wanting as to the validity thereof. Two lines of decisions by courts of last resort are in direct conflict on the point. Perhaps the leading case to the effect that such by-law is valid is the recent decision of the Supreme Court of Illinois in the case

of Steen v. Modern Woodmen of America, 129 N. E. 546, and there we find collected all authorities in support of that position. The Supreme Court of Kansas has held to the contrary in the recent case of Hannon v. Grand Lodge of A. O. U. W., 163 Pac. 169, and therein is collected a considerable number of authorities in support of the rule announced. The Kansas court quotes with approval from Utter v. Ins. Company, 65 Mich. 545, 32 N. W. 812, 8 Am. St. Rep. 913, in relation to a rule applicable generally to contracts seeking to abrogate recognized rules of evidence or to establish new ones, as follows:

"Courts will not permit the course of justice, upon trials before them, to be stipulated or contracted in such manner as to defeat the ends to be subserved by such trials. The parties to the contract cannot agree to oust the courts of jurisdiction over such contract. The operation of this clause, requiring direct and positive proof, in many cases would, in effect, preclude the court from jurisdiction and bar a recovery. If they can make this agreement, they can also stipulate that the evidence must come from certain persons, or make any agreement they see fit, controlling and directing the course of proceedings upon the trial. They may contract in relation to a condition precedent before bringing suit, or in relation to anything going to the remedy, but not to the right of recovery itself."

The Supreme Court of Kansas, in the body of its opinion, said:

"The application for membership contained an agreement to comply with all laws, rules, and regulations thereafter enacted by the order. The power of the association to make the by-law in question binding upon one who was already a member depends upon whether or not it was reasonable as applied to him. Uhl v. Life Association, 97 Kan. 422, 155 Pac. 926. If it were to be given effect in the trial of an action brought upon the beneficiary certificate previously issued to such a member, it would amount to a declaration of a rule of evidence to be applied by the court to the determination of a question of fact—a regulation of the amount and character of evidence by which such fact might be determined. It is one of the functions of a court, where the rights of the parties to a controversy turn upon a disputed matter of fact, to investigate and decide, for the purpose of that case, the question at issue. Its decision may be mistaken, but it is binding on the parties to the litigation because it is necessary that some final settlement of the disagreement should be had. That the probability of correctness may be increased, rules of evidence which experience is thought to have shown to be salutary have been established. One of them is that the unexplained absence of a person for a period of seven years, during which

time he has not been heard from, although inquiries concerning him have been diligently prosecuted, is sufficient to raise a presumption of death. The courts do not assume to say that mere absence or disappearance shall ever be given the effect of death, but that disappearance and absence for a fixed period, accompanied by certain other circumstances, may constitute prima facie evidence that death has actually taken place. For the fraternal association to require a court to disregard that rule in an action where one of the issues is whether a member, to whom it had issued a certificate payable at his death, is living or dead, would be substantially to impose upon that tribunal a new method of procedure, much as though it were to direct that death was not to be regarded as having taken place unless it should be proved beyond a reasonable doubt, or by the testimony of witnesses who saw the corpse and identified it from personal acquaintance with the member. We think such a regulation, as applied to existing certificates, is unreasonable, and therefore transcends the power of the association.

"The rule as to the circumstances under which unexplained absence shall be deemed to raise a presumption of death is so well settled in this state as to have acquired substantially the force of a statute. It has been declared and applied by the courts and acquiesced in by the Legislature. Where the rule has been confirmed by statute, by-laws similar to that here involved have been held inoperative as to certificates already in existence (Samberg v. K. O. T. M. M., 158 Mich. 568, 123 N. W. 25, 133 Am. St. Rep. 396; Sovereign Camp of Woodmen of the World v. Robinson [Tex. Civ. App.] 187 S. W. 215), and even as to those thereafter issued (Supreme Ruling of Fraternal Mystic Circle v. Hoskins [Tex. Civ. App.] 171 S. W. 812; Utter v. Insurance Co., 65 Mich. 545, 554, 32 N. W. 812, 816, 8 Am. St. Rep. 913)."

By the provisions of the by-law in question, it is provided that death may be presumed in this case, after the expiration of "the full term of a member's expectancy of life according to the National Congress Table of Mortality." The Supreme Court of Illinois argues that such a provision is not contrary to public policy, because, it says: "We do not see how it can reasonably be said that a rule of evidence based upon human experience, rather than upon necessity and convenience, is contrary to public policy." The fallacy of this line of reasoning is easily apparent. This table of mortality is made by a computation of the average length of life of all the millions of men who have been insured by companies furnishing the data. It is not based upon the length of lives of men who, like the insured here, left home and were missing for seven

years or more, but it is based upon the length of the lives of men, all but a very small per cent. of whom stayed at home. It would be impossible, of course, to know the average length of life of those insured who were missing for seven years, but if same could be prepared, it would more than likely show that these missing men, disappearing under circumstances satisfying this rule, live an average of much less than seven years after their disappearance. A table of mortality based on the experience of those lost and missing men and no other kind of a mortality table would fit the reasoning of the Supreme Court of Illinois. The rule we follow permits the company to charge and collect its annual dues on insurance for a period of seven years after the insured's disappearance. If the facts in all such cases could be known, it is more than likely that this rule brings more money into the coffers of the insurance companies than it would receive if in all cases the time of actual death could be definitely determined.

If a rule of evidence can be abrogated like this, how long will it be before the procedure in all the courts of the land will be controlled by contracts regulating the method of procedure and the competency of testimony and of witnesses and the sufficiency of proof? Why, this by-law, if valid, effectively repeals any statute contrary to its provisions. This company has made a little legislature of itself and would now perform the judicial functions of this court in controlling through this by-law how we shall determine the existence of a disputed fact. This course must be stopped at the threshold or courts of justice will become lifeless and inanimate machines, mechanically operated by contracts often unfairly depriving an unsuspecting party of statutory rights which he did not intend to surrender. So we say, because we know that a contract of life insurance usually contains but a few lines of bold type, by which the company promises to pay, and hundreds of lines of small type reciting conditions where it will not pay. In addition thereto, it often undertakes to provide by-laws which it amends from time to time providing other conditions where it will not pay. In the enforcement of valid provisions of life insurance policies, the courts, for sound and well-known reasons, must conclusively and yet arbitrarily assume that the insured read and understood the contract and acquired a copy of the company's by-laws as amended from time to time and read and understood them. This the court must hold for well-known reasons of public policy, and yet we know such presumption is usually an absurd fiction. Few read more than the lines promising

to pay; fewer yet understand the full significance of the remainder of the provisions of the policy when they have read the same, and none inexperienced in the business would think to examine the lengthy policy and by-laws of the company to learn whether it effectively repealed the acts of the state Legislature and deprived the courts of their inherent power to determine the existence of disputed facts. To confer upon an insurance company these rights is contrary to the very traditions of our government, and must not be permitted in manner attempted here, where the circumstances are such that the insured will seldom know that he is surrendering such valuable rights given him by law. The demands of public policy are the sole reasons for the establishment of this rule. It is not only enforced generally in this state by virtue of the common law adopted by our statutes, but it is specifically enacted into the statutes of the state in relation to the subject of escheat. See section 11320, Comp. Stat. 1921. The Illinois court in its decision, supra, said: "That the public policy of a state or of a nation is to be found in its Constitution and its statutes." It is inconceivable, in our opinion, to say that a by-law is not contrary to public policy when its very purpose is to abrogate a rule of evidence established for no purpose other than to serve public policy. Its sole purpose is to abrogate a declared public policy. In its brief, the company argues that this by-law should be interpreted according to the holding of the Supreme Court of Illinois, urging as a special reason that it is charted there; yet in its answer it pleads that its contract was executed in Kansas and asks that the Kansas law be applied to the defense which it originally urged but since abandoned, and based on the statute of limitation. That the separable parts of one single indivisible contract should be parceled out for interpretation among the laws of several states in order to reach conclusions favorable to the party who wrote the contract is novel, but we are unable to find authorities justifying us to do so. The company ought not to complain that we here adopt the interpretation of the law concerning its by-law as made by the Supreme Court of Kansas, because it was there the contract was executed and delivered to the insured. In the case at bar, the by-law in question was adopted by the company after the insured received his benefit certificate, and therefore comes clearly within the Kansas decision. As the Kansas law on that point is not pleaded in this case, the decision of the Supreme Court of that state is not absolutely controlling, but we follow it here because we approve the reasoning as therein announced. We hold this by-law is

absolutely void, regardless of whether it was adopted before or after the issuance of the benefit certificate.

Finding no error in the record, the judgment of the lower court is affirmed.

JOHNSON, C. J., and NICHOLSON, HARRISON, MASON, and WARREN, JJ., concur.