## NORTHWESTERN MUTUAL LIFE INS. CO. v. RUTLEDGE.

## FIDELITY MUTUAL LIFE INS. CO. v. SAME.

No. 24502.   Nov. 19, 1935.

Shipman & Lewis, for plaintiffs in error.

Rowland & Talbott, for defendant in error.

PER CURIAM. The defendant in error, hereinafter referred to as plaintiff, commenced these actions in the district court of Washington county, Okla., on January 22, 1932, against the defendants upon two policies of life insurance issued upon the life of the plaintiff's husband, Leon H. Rutledge. The policy of the Northwestern Mutual Life Insurance Company was issued October 19, 1920, for the amount of $2,500. The policy of the Fidelity Mutual Life Insurance Company was issued September 6, 1919, for the sum of $3,000.

The plaintiff alleged and proved that she and Leon H. Rutledge were married in Kansas City, Mo., in the year 1917, and that thereafter they lived together and made their home in Bartlesville, Okla., until April,

1923. That prior to 1923, the said Leon H. Rutledge was afflicted and suffered considerably with sinus trouble, resulting in severe headaches, and in June, 1922, upon the advice of local physicians, he went to Mayo's Clinic at Rochester, Minn., for an operation. He returned some six weeks later, but went back to Mayo's about the last of August or the first of September, and stayed until about October 22, 1922. In April, 1923, Leon H. Rutledge left home for the last time, presumably because the doctors had advised him that his health required that he live in the north, somewhere on a line with Chicago, Ill. The plaintiff received several letters from her husband thereafter, the last being dated March 20, 1924, from Dewey, Okla. The letter, which was introduced in evidence by plaintiff to show the attitude of Rutledge towards his family, and his mental and physical condition, reads as follows:

"Dear Dottie:

"I was in Bartlesville this morning but did not come to see you. I have been in a sanitarium in St. Louis for about three months. I ran away three days ago. Sometimes I am fine and then I go out of my head for three or four days at a time. I am going down to Texas and if I ever get well I am coming to Oklahoma and get you and our baby.

"Many times I have felt like killing myself, but something tells me not to. I weigh 169 pounds. God bless you all, from Leon."

Friends of the family and numerous other witnesses testified that Leon H. Rutledge was a dutiful and loving husband, being very attentive to his wife and baby. The plaintiff testified that ever since March 20, 1924, the date of the last letter from her husband, she has made diligent efforts to locate or get in contact with him. That she had solicited the help of L. U. Gaston, chief of police of the city of Bartlesville, and that the latter had caused pictures of Rutledge to be sent to cities and towns where he might be located or make an appearance. That she also solicited the help of Mr. L. W. Turner, who succeeded Mr. Gaston as chief of police of the city of Bartlesville, and wrote numerous letters of inquiry to friends and relatives at distant points. Mrs. Rutledge also obtained the help of S. N. Hawkes, one of the attorneys for the Empire Company, and he was unable to obtain any information as to the whereabouts of her husband.

It was not denied that the plaintiff had paid, and defendants had accepted, premiums on the policies in question up to the time of the filing of this suit on January 22, 1932. The pleadings in both cases were substantially the same with the exception of the amounts sought to be recovered. Plaintiff contends that the unexplained absence of her husband for more than seven years raises a common-law presumption of his death, and entitles her to recover, as beneficiary, the proceeds of the respective policies of life insurance from each defendant, less certain small sums which were loaned to the insured on each policy.

The defendants alleged and offered evidence that Leon H. Rutledge, upon one of his visits to Mayo's, became acquainted with a nurse; that thereafter he was seen on several occasions with a woman who represented herself to be the plaintiff herein, Florence E. Rutledge, and that this woman signed her name, with that of Rutledge, to an application and procured a loan upon each of the policies herein sued upon, representing herself at the time to be Florence E. Rutledge. The records of Mayo Clinic revealed the fact that Leon H. Rutledge had last appeared there on July 13, 1922, and had not been seen since that time. Carl B. Wood and Fred Gregory, both of Bartlesville, Okla., testified that after the insured returned from Mayo's Clinic he showed them a picture of a nurse, stating that he ran around with her while at Mayo's, and that he was "strong for her." A. W. Gardner of Rochester, Minn., testified that he had cashed a check for Rutledge for $100 which came back marked "no account." A. T. Twesne of Galesville, Wis., testified that in the summer of 1923 he met Rutledge and a woman he represented as his wife, and that he cashed a check for him which later came back marked "no funds." Other witnesses who testified that they had been defrauded by Rutledge on bad checks and the amounts of each were as follows: Dr. Yazel, Kansas City, Mo., $420; G. B. Barnett, Joplin, Mo., $150; Ira Ivan Flipp, Pittsburg, Kan., $50; Dr. E. H. Polhamus, Tulsa, Okla., $200; Edwin Wagner, New York City, New York, $382.10.

Defendants alleged and contended at the trial that the presumption of death after seven years' absence never arose in this case, due to the fact that the absence of the insured was explained by the fact that Leon H. Rutledge had become entangled with another woman, and had committed fraudulent acts in the states of Oklahoma, Kansas, Missouri, Minnesota, Wisconsin, and New York.

The defendants first insist that the judgments of the lower court should be reversed for the reason that the trial court should have sustained their motions for directed verdicts. In this connection their argument is that the presumption of death does not arise unless the absence is unexplained, and that sufficient evidence was introduced to explain the absence of the insured, and that, therefore, the presumption of death could not, and did not arise.

In the case of Modern Woodmen of America v. Michelin, 101 Okla. 217, 225 P. 163, this court gave rather a comprehensive review of the development of the common-law presumption of death after seven years of unexplained absence. There the court said:

"In Jones on Evidence, vol. 1, p. 302, par. 57, it is said:

"'Presumptions of Death after Seven Years' Absence — Origin of Presumption. * * * Like all other rules, it took its shape from necessity—the necessity of settling property rights and very often status. As the courts had to resort to the presumption of the continuance of life, in the absence of direct proof of life or death, in order to settle important rights which were often involved, it became equally necessary to adopt some counter presumption in classes of cases where the death of the person would in the ordinary course of events seem more probable than the continuance of life. Accordingly, in analogy to certain English statutes, the courts adopted the rule that 'a person, shown not to have been heard of for seven years by those (if any) who, if he had been alive, would naturally have heard of him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death.' Thayer, in his usual thorough way, gives an interesting and instructive account of the presumption, and fixes its application in its present form as of 1805, and that it appeared for the first time in the text-books in 1815, and was speedily followed by other eminent writers, ending in 1876 with Stephen. 'Here, then,' says Thayer, 'in seventy years we find the rule about a seven years' absence (1) coming into existence in the form of a judicial declaration about what may or may not fairly be inferred by a jury in the exercise of their logical faculty; the particular period being fixed by reference to two legislative determinations in specific cases of a like question; (2) passing into the form of an affirmative rule of law requiring that death be assumed under the given circumstances. This is a process of judicial legislation, advancing from what is a mere recognition of a legitimate step in legal reasoning to a declaration of the legal effects of certain facts.'

"Same—American Development of the Presumption.—In this country the rule has generally been applied only to those who were absentees from their homes; and it is thus stated in a Massachusetts case: 'If a man leaves his home and goes into parts unknown and remains unheard from for the space of seven years, the law authorizes, to those that remain, the presumption of fact that he is dead; but it does not authorize him to presume, therefore, that any one of those remaining in the place which he left has died.' It is not necessary, in order to raise this presumption, that the removal should be beyond the seas or even to a distant state; but if one removes from his state to a fixed place of residence in another state, the fact that he has remained unheard of in the former state does not alone authorize the presumption. It need hardly be added that this is not a conclusive presumption. It is one of fact and is subject to be controlled by the facts of the case. It is one which varies in weight according to the circumstances. The presumption under discussion is an arbitrary one, rendered necessary on grounds of public policy in order that rights depending on the life or death of persons long absent and unheard of might be settled by some certain rule. It is not enough to raise the presumption that the person has not been heard from for seven years. It is not only necessary to show this, but also to show his absence from home and that inquiry has been made at the place of residence of such person abroad, if he had any known fixed residence. And this is so even though such residence is beyond the seas; but no inquiry need be made at places merely visited.'

"The Supreme Court of Iowa in the case of Haines v. Modern Woodmen of America, 189 Iowa, 651, 178 N. W. 1010, said:

"'It is first argued for the appellant that the presumption of death from disappearance and continued absence of seven years does not arise, unless it be further shown that the missing person had been diligently sought and inquired after without avail, and that there is in this case a failure of such proof. There is considerable variance in the view of the courts upon this feature of the rule. By some the idea expressed by appellant's counsel is approved, and the party relying upon the presumption must show a high degree of diligence in making inquiry and search. By others it is distinctly held that proof of disappearance and continued unexplained absence for seven years, without being heard from by those with whom, in the natural course of things, the person would be likely to communicate, is all that is necessary, and that the presumption is not rebutted or overcome by a failure to show specific acts of search or inquiry. Miller v. Sovereign Camp, 140 Wis.

505, 122 N. W. 1126, 28 L. R. A. (N. S.) 178, 133 Am. St. Rep. 1095; Page v. Modern Woodmen, 162 Wis. 259, 156 N. W. 137, L. R. A. 1916F, 438, Ann. Cas. 1918D, 756.

" 'In none of our cases have we gone to either extreme. We have said that "when (the absence) is shown to have continued for seven years, * * * unaccompanied by circumstances which reasonably account for his disappearance on a theory not involving his death, it becomes sufficiently strong to cast the burden of rebutting it upon the party asserting a continuance of life. * * * Slight evidence may sometimes be sufficient to rebut the presumption of death; but ordinarily it is a question for the triers of fact to determine whether the presumption shall prevail. In short, the circumstances both for and against the theory of death are to be taken into consideration, and therefrom the truth arrived at as nearly as may be possible under the established rules of law governing the adjudication of disputed facts." Magness v. Modern Woodmen, 146 Iowa, 5, 123 N. W. 171.

" 'Such is also the effect of our recent decision in Richey v. Sov. Camp Woodmen, 184 Iowa, 10, 168 N. W. 276, L. R. A. 1918F, 1116. And see Kennedy v. Modern Woodmen, 243 Ill. 560, 90 N. E. 1084, 28 L. R. A. (N. S.) 181.'"

In the present case, plaintiff proved, and no evidence was offered to contradict the fact, that since March 20, 1924, she had heard nothing of the whereabouts of her husband, Leon H. Rutledge, and had made numerous and diligent efforts to locate him. Under the rules announced in Modern Woodmen of America v. Michelin, supra, this evidence was sufficient to raise the presumption that Leon H. Rutledge was dead, although this presumption could be rebutted by the defendants offering evidence that Leon H. Rutledge had been seen during the seven-year period, or other facts tending to explain his absence from his home. Here, the defendants offered evidence that Leon H. Rutledge had committed various criminal acts in several states, and that on occasion Rutledge had been seen in company with a woman other than his wife. This all occurred prior to March 20, 1924, the date upon which Leon H. Rutledge was last heard from, and dropped finally from sight. The question as to whether or not the prima facie presumption of Rutledge's death, created by plaintiff's evidence, had been overcome by the evidence offered by the defendants to explain his absence thus became one for the triers of facts, or jury, and it was for them to say, after being properly instructed by the court, whether or not Leon

H. Rutledge was alive or dead. The finding of the jury amounted to this, that, under all the facts and circumstances shown by the evidence, the absence of Leon H. Rutledge for seven years was not satisfactorily explained on any theory other than his death.

In 17 C. J. 1173, section 15, this rule is stated:

"Question for Jury. The general rule is that where there are circumstances tending to rebut the presumption of death the question whether the person is dead or alive is for the jury to determine upon all the evidence. * * *"

In Fuller v. New York Life Insurance Company, 199 Fed. 897, 118 C. C. A. 227, a Pennsylvania case, the facts were very similar to the case at bar. There the insured had disappeared on a certain date, and the wife of the insured had made diligent efforts to locate him. In a suit on insurance policies, the defendant offered evidence that the insured had embezzled some six thousand dollars while acting as treasurer for a borough. There the court said:

"He who relies upon an unexplained absence during seven years must prove it, and he must prove more than the mere fact of absence during that period. He must also produce evidence to justify the inference that death is the probable reason why nothing is known about the missing person. In the ordinary trial at law a jury must draw the inferences, both intermediate and final; and it will rarely, if ever, be the case that the facts concerning one absence will so closely resemble the facts concerning another that inferences drawn in the first inquiry will furnish a binding rule for the second. If a dispute exists about any of the facts, the jury must first determine it, and they are then to draw from the facts thus ascertained whatever inferences may be proper."

This is the correct rule, and the trial court properly submitted the facts in this case to the jury for their consideration. See, also, Equitable Life Assurance Society of the United States v. Sieg (Guardian Life Insurance Company of America v. Same, John Hancock Mutual Life Insurance Company of Boston, Mass., v. Same), 74 Fed. (2d) 606; Meckert v. Prudential Insurance Company of America (N. J. L.) 176 Atl. 587.

The defendants next complain of instruction No. 14, given by the trial court. This instruction reads:

"You are instructed, as a matter of law, that if you find from a preponderance of the evidence in this case that the insured

left his residence and home and has been continuously absent therefrom for the period of over seven years without any intelligence being received of his whereabouts by the members of his family, relations, neighbors and acquaintances within said period or at any time thereafter, although diligent inquiry and search were made, then such continuous absence together with such lack of intelligence raises the presumption of the death of said insured, and the jury on such proof has a right to presume his death, unless this presumption is rebutted by other evidence referred to and explained in these instructions."

The defendants insist that by this instruction the court assumed that the presumption of death arises from a part of the evidence, and that it then becomes the duty of the defendants to overcome that presumption by proof tending to explain the absence, without tidings, upon some other theory than that of death. This instruction must be construed with all of the other instructions upon which the case was submitted to the jury. We believe that the presumption of death does arise by a showing by the plaintiff of the unexplained and continued absence of a person for a period of seven years, without tidings, and diligent efforts to locate the missing person having been made, and that such evidence makes a sufficient prima facie case to raise the presumption. The burden of proof is then thrown upon those rebutting the presumption of death to attempt to overcome the same by competent evidence. We find no error in the giving of instruction No. 14 when the same is construed in conjunction with other instructions by the trial court outlining what evidence may be considered as rebutting the presumption of death.

The defendants complain that the introduction in evidence of the letter from Leon H. Rutledge to this plaintiff, which letter was from Dewey, Okla., under date of March 20, 1924, constituted reversible error, and was prejudicial to the rights of said defendants. The letter has heretofore been quoted in this opinion, and will not be repeated. In United States v. O'Brien, 51 Fed. (2d) 37. a Virginia case, it is said:

"More than seven years have elapsed and the presumption of death has arisen, so that even on the narrow view of the admissibility of such notes we think that there was a sufficient showing as to the death of Cartier by evidence other than the notes themselves to justify their admission. Such notes have been commonly admitted to show the manner of death where that is the chief issue under investigation. We see no reason why such notes should not be admitted where the time of death is the chief issue to be ascertained. Deliberate suicide growing out of troubles is generally the result of continued worry. In the vast majority of cases when financial difficulties are the background out of which suicide grows, the suicide is accompanied by some note or final message explaining the reasons for taking this step; spontaneity is the necessary requisite for the admission of statements oral or written on the principle of being a part of the res gestae. A man's note to his wife written shortly before actual suicide, and while under the compelling influence of a fixed determination to take his own life, flows from the fountain of strong emotion and fixed intention, just as genuinely as word of mouth spoken in the very commission of the act itself. * * *

"The statement of the rule as made by Greenleaf clearly covers the present case (13th edition, vol. 1, page 132): 'So, also where a person * * * is upon a journey, or leaves home, or returns thither, or remains abroad or secretes himself, or, in fine, does any other act material to be understood; his declarations, made at the time of the transaction, and expressive of its character, motive or object, are regarded as "verbal acts, indicating a present purpose and intention," and are therefore admitted in proof like any other material facts. So, upon an inquiry as to the state of mind, sentiments, or dispositions of a person at any particular period, his declarations and conversations are admissible. They are parts of the res gestae'."

The letter undoubtedly constituted a part of the res gestae, and was admissible as such. There was already testimony in the record that Leon H. Rutledge was a sick man, and that at times he was irrational. The letter constituted another circumstances in the chain of events which had a material bearing on his unexplained absence for seven years.

It is significant in this case that although the testimony offered on behalf of the defendants to rebut the presumption of death was voluminous, yet all of the acts or events upon which they offered evidence in an attempt to rebut the presumption occurred prior to the letter to the plaintiff on March 20, 1924. From that time until the filing of these petitions on January 22, 1932, seven years had elapsed without any word having been received of Leon H. Rutledge, although the plaintiff herein has proved that diligent and more or less painstaking efforts were made by her to either locate him

or to obtain some knowledge concerning his movements or whereabouts. The jury undoubtedly believed that the fact that Leon H. Rutledge had disappeared on March 20, 1924, and had not been heard from for seven years subsequent to that time overcame the evidence offered by these defendants to rebut the presumption of death.

No reversible error appearing, the judgments of the trial court are affirmed.

The Supreme Court acknowledges the aid of Attorneys E. S. Champlin, Frank Carter, and David Bucher in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Champlin and approved by Mr. Carter and Mr. Bucher, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., and BAYLESS, WELCH, PHELPS, and CORN, JJ., concur.