MID-CONTINENT PETROLEUM
CORP. v. JAMISON, Adm'r.

No. 30832.   April 30, 1946.

Rehearing Denied June 25, 1946.

Application for Leave to File Second
Petition for Rehearing Denied
Sept. 10, 1946.

*171 P. 2d 976.*

R. H. Wills, J. H. Crocker, I. L. Locke-
witz, J. P. Greve, Ben Hatcher, and C.
A. Kothe, all of Tulsa, and J. E. Thrift,
of Sapulpa, for plaintiff in error.

W. L. Shirey, of Tulsa, and Speak-
man & Speakman, of Sapulpa, for de-
fendant in error.

BROWN, Special J.   This is an ac-
tion brought in the district court of
Creek county by Alexander Jamison,
administrator of the estate of Pearl O.
Crawford, deceased, against the Mid-
Continent Petroleum Corporation, a
corporation, to recover damages be-

cause of the alleged wrongful death of Pearl O. Crawford.

Briefly, the facts are these: The deceased Crawford had been employed by the defendant at its refinery for a period of about 17 years prior to his death. On the date of his death, however, which was May 30, 1936, he was assigned and directed to work as a helper at the Heavy Oil Lube Agitator Department. He reported for work in this department at about 12 o'clock noon on the day of his death. While working at this heavy lube oil agitator he inhaled fumes from escaping gas. He died in approximately three hours thereafter.

The heavy oil lube agitator building is a structure about 60 feet long, 30 feet high, 20 feet wide, and five doors and six windows as ventilation outlets. In the building are located three large metal cylindrical vessels of about 15 feet in diameter extending from about eight feet from the floor of the building through and above the roof. These vessels, commonly known as heavy oil lube agitators, contain heavy oil which is treated with sulphuric acid introduced into the agitators at the top, and the oil is stirred or agitated therein by the force of air which creates a general reaction causing a substance known as sludge to settle in the cone-shaped base of the agitator. At the base of the agitator there are two valves which are required to be opened to start the operation of drawing off the sludge. The sludge flows through a drainage pipe six inches in diameter which extends from the base of the agitator to a point about ten feet outside the building, where it gives off sulphuric dioxide fumes which are at this point dissipated into the air. After the oil has been treated and churned in the agitator the strength of the acid is somewhat spent. The air forced into the agitator is then shut off and the sludge permitted to settle in the cone-shaped base of the agitator. The operation of drawing off the sludge requires the opening of two valves at the bottom of the agitator. This detail requires about two minutes.

It was this operation that Pearl O. Crawford, deceased, was engaged in performing or assisting in performing on the day of his death. The entire operation of drawing off the sludge from an agitator requires about 20 minutes. The employees, however, carrying on such an assignment are not required to stand at or near the agitators during the 20 minutes required to complete the task. Such employees at all times are free to move away from the agitators to the open air while the sludge is draining off. The building in which the agitators are located is so constructed that it is at all times easily accessible to the open air by one of the doorways a short distance from the agitators. We shall state the facts and evidence in more detail in discussing the errors assigned.

It is the contention of the plaintiff, and he also alleged in his petition, that Crawford's death was caused by the inhalation of these gas fumes while working at the heavy oil lube agitators. The grounds of negligence relied on and pleaded consist of the negligence of the defendant in failing to furnish deceased a safe place in which to work and safe appliances and tools with which to work, in that it failed to provide suitable vents for dissipating the gas fumes into the air; failed to furnish deceased with a gas mask and failed to provide safe and sufficient appliances and equipment and that the valves were leaking and in need of repair, thus causing an excessive quantity of gas to escape; that defendant was negligent in that it failed to warn deceased as to the dangerous character of his employment and failed to inform him as to the protective measures.

The defense consisted of a general denial, a plea of contributory negligence and assumption of risk and the affirmative defense that deceased died from natural causes not attributable to or connected with his employment.

The trial resulted in a verdict and judgment in favor of plaintiff. Defendant has appealed and as grounds for reversal assigns numerous errors.

1. A more particular statement of the facts is not necessary here because of the necessity of discussing certain features of the case in connection with the various assignments made by the defendant. In its first assignment, the defendant challenges the sufficiency of the evidence in its showing of any failure of the defendant in giving warning of any existing danger. This challenges the major portion of the record in this case, and while the defendant has divided his assignment in four divisions, we think all of the divisions can be discussed in a more or less general way, with particular evidence set out as to certain features. When crude oil is brought to the defendant's refinery, certain processes are used for taking out gasoline and kerosene, and then a heavier substance is left from which is extracted oil, waxes, and perhaps some greases. In order to get at these products and have them delivered in the final commercial stages, it appears necessary to introduce certain outside substances. At this particular refinery, the substance known as sulphur dioxide was used. This is introduced into the very large containers, referred to as agitators, and by this process the oil is separated from the asphaltic substance; the oil is drawn off and a sludge is collected in the cone-shaped base of the agitator. In the process of stirring and agitating the sulphur dioxide with the heavy oil, heavy fumes are formed. The greater portion of these fumes escape through the top of the agitators and is carried off in the atmosphere. There is remaining in the sludge some of the sulphur dioxide which, after becoming mixed with this particular form of liquid, takes on the name of sulphuric acid. In drawing off this sludge, the fumes are again released and the employee who does this work comes in very close contact with the fumes. Sometimes this is in a comparatively light form; sometimes the fumes are very heavy, but in whatever form they arise they are very unpleasant to the human system, causing much discomfort to the eyes, nostrils, and any portion of the head or face directly exposed. It also appears that this substance in its final form, referred to as sulphuric acid, has the effect of corroding the pipes and parts of the machinery, so that the machinery is frequently in need of repair, and usually allowing some escaping fumes through the corroded pipes. At least, it appears necessary to have a crew almost constantly at work on these repairs. Then when the valves are turned and the sludge is allowed to run out, the fumes become very heavy. The experienced worker knows very well that he can remain within reach of these fumes only a very short time. The natural resistance of the human system to the effect of the fumes is so strong that the worker is actually driven out of the immediate neighborhood of the fumes. As to whether he receives injury from the fumes of a considerable nature or as to whether he escapes with only a light injury and unpleasantness depends on the length of time in which he stays at the particular place where the fumes are escaping.

This situation was well known to the defendant and its agents who had charge of this particular work. Much thought and effort had been given to the proper protection of the employees against this. The Safety Department had considered the wearing of gas masks, and while our State Safety Department had recommended the wearing of gas masks, it was not a requirement. In view of this study a few gas masks had been supplied. There were some of these masks available. The inconvenience of working with the gas masks and likewise some discomfort in wearing the same appears to prevent the general use of the gas masks, although it was one step in the matter of safety. Also, due to the fact that these fumes were so unpleasant as to cause indigestion and other physical discomforts, soda was available for the injured employee to take, which usually gave some relief. The employees at this particular work had become seriously affected, and it had been made the duty of the foreman in charge of this work to guide and direct the actions of the men under

him. These various resulting matters from contact with these fumes were so well known that the operator knew of the dangerous nature of the fumes and the resulting discomforts and physical injury. There is much evidence as to whether or not any injuries had ever resulted in death, but the fact of some resulting injury is well established.

The evidence on the part of the defendant, from men who had given much study to this process, shows that the employee had to get out of these fumes within a short time, and one witness states:

"There is very little danger from sulphur dioxide poison because the fumes are so irritating to the eyes and throat that the victim is compelled to seek air at once."

With this situation being well known to the defendant, the question is then suggested as to whether the proper precautions were taken to guard against these ill effects, and especially to guard a new employee who, even though he has been employed at the plant a long number of years, would be unused to this particular part of the employment and the dangers incident thereto. The deceased in this case was called from his regular work at the hour of 12:30 p. m. One feature of this employment that seemed to interest the deceased was the fact that a slightly higher scale of pay existed in that department and he was anxious to get this additional pay. This increase in pay, perhaps given because of the unpleasant work and perhaps because of the dangers incident thereto, is a further proof that the defendant knew of the dangers incidental to the work. The deceased had not performed this kind of work prior to that time. He went immediately to the department known as the lube agitator room. Apparently he was not advised of gas masks being available or necessary. So far as the record shows the immediate foreman did not warn him of the necessity of getting into the fresh air as quickly as possible after the valves were turned on. When the sludge was drawn off, as shown by the evidence,

he got a heavy shot of these fumes. He exhibited all the symptoms characteristic of the previous employees who had likewise breathed these fumes. Then he withdrew from his work, was away for a while during which he had his lunch, then returned to his work. When he went back to his work, it was in the same or adjoining room and there is some evidence that fumes were still present not only from this sludge but from the removal of what is referred to as the soda ash. He became violently ill and made an effort to get the soda the other employees usually took, but before obtaining this he was in such a serious condition he could not take this preventive, and expired at the hour of 2:30 p. m.

The defendant was engaged in the production of this commercial product, lubricating oil, and had been engaged in this business for a long period of time. There is some question as to the method used in refining this product, but since the defendant had adopted this plan and since it was accepted by a great portion of this industry, it does not appear that the plan of operation can be seriously questioned. The defendant was well acquainted with all of the methods used and the resulting effect upon the employees engaged in this work. It was well known to the defendant that these employees had been given indigestion and stomach trouble. The acid fumes caused the employees "to bloat." Frequently employees became sick and would vomit. It was known to this particular department and the foreman in charge that close proximity to the valves while the sludge was being drawn off would cause such intense suffering that unless the employee withdrew very speedily he would be overcome, and other employees engaged in this work had been seriously affected and it was only a question of retreating to a place of safety within a short time or perhaps more serious consequences would follow. While the death of no employee had occurred at this plant from this operation, it appears natural to assume that with the suffering endured by many of the employees that at some time the

serious consequences of death might result. This appears to be a natural assumption. The death of this employee under these circumstances is not a matter beyond the reasonable expectations of anyone in charge of this work. The case of Allen v. Shell Petroleum Corporation, 146 Kan. 67, 68 P. 2d 651, is urged as presenting the theory in this case. In that case the evidence did not show that the refining company knew of the poisonous or dangerous effects of the fumes as the evidence in this case shows. That makes such a difference in the two cases as to void the Allen Case being controlling herein. The general rule is stated in 39 C. J. 491, as follows:

"Regarding the duty to warn employees of the hazards of the work, the master is charged with knowledge of the usual and ordinary dangers and hazards to which he is exposing his employees, and is bound to know the normal condition of his premises, and to know of the nature of the constituents and general characteristics of the substances used in his business, so that he can give directions for the conduct thereof with ordinary safety of his servants performing the work with ordinary care; and particularly is the master chargeable with a knowledge of risks ascertainable only through a knowledge of scientific facts which an uneducated man is not presumed to know; the doctrine that imputes this knowledge to the master is called the 'assumption of skill,' and for the purpose of determining this knowledge the law has a standard which does not vary with the actual capacity of the particular master, and consequently his ignorance is no excuse for a failure to warn; . . . ."

The defense relied upon to a great extent by the defendant in this case, that no previous employee had died as a result of this situation, is rendered less forceful by the fact that employees had been seriously stricken, had suffered, and by reason of procuring relief from the use of medicine had recovered. The fact that death had not occurred previous to this time is not necessarily a defense against what might be reasonably expected to occur. This court, in the case of Oklahoma Gas & Electric

Co. v. Busha, 179 Okla. 505, 66 P. 2d 64, states:

"The omission by the court of a 'foreseen or expected result' clause, requested by defendant, from an instruction on 'proximate cause' is not error."

So we have a condition existing of which the defendant had full knowledge; knowledge that serious physical injury not only could result but had resulted on previous occasions.

Did the deceased have such knowledge of this situation as to put him on warning of the full dangers? The deceased was, until two hours prior to his death, and back for a period of approximately 20 years, employed in a separate department of defendant's operations. He was employed as a laborer in the Filtering Department. It does not appear from the evidence that he had ever had occasion to acquaint himself with the particular work in the department where he was engaged at the time of his misfortune. It is doubtful if he knew or had any occasion to know of the dangers incident to the work in the department where he was placed by the defendant on the date of his death, and it would be indulging too strong an assumption to state that he was acquainted with the dangers incident to this work to the full extent that would place the responsibility on him of assuming the risks of this particular employment.

On the question of the exact cause of the death of the deceased the record contains a great deal of testimony, both for the plaintiff in this case and the defendant. The very extensive testimony on behalf of the defendant shows the extensive investigation into the cause of this unfortunate death. The quality of the defendant's testimony brought out by witnesses of great learning, experience and standing, and the great details into which this testimony led showing the probability and much likelihood that the death resulted from other causes, is very impressive. A most thorough investigation appears to have been made and over an unusually extended time and an impressive array of facts was presented to the trial court.

On the part of the plaintiff in this case the evidence was presented of a medical nature and with a rather clear outline of the facts to the effect that the deceased came to his end as a result of inhaling these fumes. The connection that is made by this medical testimony with other cases arising in the same manner and of other persons affected the same way, although not resulting in death, makes a close alignment of the facts incident to the death of Pearl O. Crawford and the injury sustained by inhaling the fumes. This medical testimony on behalf of the plaintiff was also carefully brought out. Apparently no essential details were omitted and the close proximity of the death, in point of time, to the injury admittedly sustained is also strong and impressive testimony. It would be difficult to see a case presented, both from the standpoint of the plaintiff and the defendant, where a greater care on the part of both litigants and more careful supervision of a court could be found than in this case on this particular question. Certainly the trial court had before it substantial evidence, and this matter was submitted to the jury, insofar as the evidence is concerned, on a direct and much disputed question of fact. In the case of Seekatz v. Foltz, 118 Okla. 159, 247 P. 413, the rule is stated as follows in the first paragraph of the syllabus:

"The credibility of a witness and the effect and weight to be given to inconsistent or contradictory testimony are questions of fact to be determined by the triers of fact, whether court or jury, and not questions of law for the court. It is peculiarly within their province to weigh the testimony of the witnesses, as well as all the facts and circumstances tending to corroborate or to discredit them, and determine the case according to the preponderance of the evidence."

2. A second assignment of error presents the objection to certain medical testimony brought out in the course of the examination of Dr. Walker, witness for the plaintiff The record shows that after this witness testified on direct he was taken on cross-examination and inquiry was made into his knowledge of this particular ailment, and in the course of that examination and on questions submitted by the defendant, it was developed that Dr. Walker referred to a case reported in a book written by Dr. Alice Hamilton. On this cross-examination, the doctor was submitted to the most severe cross-examination to test his knowledge of the reported case, the similarity of that case to the one before the court, and altogether some 40 pages of the testimony are covered by this very careful cross-examination, redirect examination, and recross-examination so that the whole question of the likelihood of death resulting from inhaling of the fumes, the treatments accorded, the appearance of the affected party, were gone into. The question complained of by the defendant is a further reading from the book by plaintiff's counsel of a matter in the form of a question, further testing the knowledge of the witness. It appears that the question, itself, was only a matter of further testing the witness' acquaintance with this subject and it was provoked by the counsel for the defendant by his rather careful and extensive cross-examination. It is a part of the course of the inquiry initiated by this cross-examination. In Brownell v. Moorehead, 65 Okla. 218, 165 P. 408, the rule is stated as follows:

"The trial court was not in error in admitting this testimony, for two reasons: First, the testimony was elicited upon cross-examination by defendant's counsel and the objection made was by motion to strike. An Ardmore Milling Co. v. Robinson, 29 Okla. 79, 116 P. 191, this court said:

" 'It is not admissible for counsel to be quiet and allow the evidence to come out and take advantage of it, if favorable, and, if not, to ask that it be stricken out and not considered'

"—and quoted the expression used in State v. Efler, 85 N. C. 585:

" 'Still less can he complain when it comes out in response to his own inquiries.' "

It further appears that the additional evidence complained of by the defendant are matters that were brought out in the rather extensive examinations

and cross-examinations of these medical witnesses, some on hypothetical questions and some on quotations from medical books, and that these matters in which both parties, plaintiff and defendant, by their encouragement and eliciting, brought before the court and the jury. It is difficult to say where any prejudicial error occurred therein when the record is carefully examined and it does not appear that any injury occurred to the general welfare of the case. The trial judge was exceptionally careful in admonishing the jury on all stages of the testimony as to their duty and as to what should be considered and what should be overlooked. We do not think that any prejudicial error occurred on these matters.

3. In argument of the case to the jury, counsel for the plaintiff made several statements to which objection was taken by the defendant, and the trial court, during the course of this running fight of words, took occasion to admonish the jury in the following words:

"Gentlemen of the jury, I will say to you as I have said before, the attorney may argue the testimony and any legal deductions or logical conclusions he may draw from the testimony, but you are the judges of the testimony and whether or not that was the testimony, that is as far as I am going with you."

This statement of the court to the jury is a very concrete outline of this matter that the jury had for its consideration. It is to be expected that counsel, in the heat of argument, may make some deductions that are too violent, perhaps not in so many words borne out by the testimony. When such irregularities occur and if the same might be calculated to mislead the jury, the court's supervision becomes very necessary, and when properly exercised in directing the minds of the jury back into true channels it should avoid the dangers incident to such conduct that might produce any injury. A careful examination of the argument objected to with a consideration of the court's instruction to the jury is convincing that no reversible error appears on the objections thus made.

4. What caused the deceased to come to his death in the manner and at the time as set forth by the pleadings in this case becomes a material issue. The testimony on this included the statements of the employees at the plant at the time the parties came to render first aid and a considerable amount of medical testimony. The court gave instruction No. 12 on which the defendant predicates error, and this instruction is as follows:

"The court instructs the jury that testimony has been given by certain witnesses who, in law, are termed experts, and, in this connection, you are instructed that while in cases such as the one being tried, the law receives the evidence of men, expert in certain lines, as to their opinion derived from their knowledge of particular matters, the ultimate weight which is to be given to the testimony of expert witnesses is a question to be determined by the jury, and there is no rule of law which requires you to surrender your own judgment to that of any person testifying as an expert witness, or to give controlling effect to the opinion of scientific witnesses; in other words, the testimony of an expert, like that of any other witness, is to be received by you and given such weight as you think it is properly entitled to; but you are not bound or concluded by the testimony of any witness, expert or other.

"The court instructs the jury that before the opinion of the expert has any value whatever, the jury must first find to be true the facts on which such opinion is based."

In this case the jury had much to consider in addition to the medical testimony and in all probability the court had in mind the weight of the other testimony in this case, which the jury had a right to consider, and therefore the instruction contained the sentence which appears to be offensive to the defendant, telling the jury, in effect, that the medical testimony was not necessarily controlling of their verdict on this question. No instruction was offered by the defendant on this particular question

although defendant did submit 51 different suggestions. We cannot say that this instruction is misleading under the facts in this case. It appears that the rule set forth in 4 C. J. S., pp. 623, 624, is as follows:

"The fact that instructions are too narrow or too broad, or that the court fails to state or charge on all of the issues or defenses, or charge with sufficient accuracy or completeness on the issues submitted, or omits to state a proper qualification or limitation of a rule of law given, or to state the qualification or limitation in immediate connection with the rule, or that an instruction given needs qualification or modification, is not available error, unless the attention of the court is called thereto by a special request for an instruction remedying the defect."

And further this court has stated in Producers' Oil Co. v. Eaton, 44 Okla. 55, 143 P. 9:

"A jury cannot be instructed to wholly disregard the admissible opinions of expert witnesses, nor that no reliance is to be placed on or aid gained from the same; but it is not error to instruct them that they may disregard such evidence if they deem it unreasonable or not entitled to belief because of other and contradicting evidence from witnesses claiming positive knowledge."

The offered instructions of the defendant, 1 to 51, have been carefully examined, and we do not see where the substance of any offered instruction has been neglected in the instructions given by the court on any matter material to the issue in this case, and the court's instructions seem to substantially state the issues involved without material prejudice to the defendant's cause.

5. After the verdict of the jury was entered in this case, the defendant filed its motion for new trial and thereafter filed its supplemental motion for new trial. This supplemental motion was filed 14 days after the close of the term of court in which the judgment was rendered. At the hearing on this supplemental motion the defendant offered to introduce evidence to substantiate the motion. The proceedings of the court on this question are material to the full determination of the question involved and it appears to be necessary to give consideration to what took place at that time and in what manner the court considered the same. The procedure set out by our statutes as to an application addressed to the court for a new trial is substantially different from the procedure set out for the filing of a petition for a new trial after the term. 12 O.S. 1941 § 653:

"The application for a new trial must be made at the term the verdict, report or decision is rendered, and, except for the cause of newly discovered evidence, material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial, or impossibility of making a case-made, shall be within three days after the verdict or decision was rendered, unless unavoidably prevented. R. L. 1910, § 5035."

Now, after the term has expired and the party desires to present evidence to the court justifying a claim for a new trial, he can file his petition as set out in 12 O.S. 1941 §655:

"Where the grounds for a new trial could not with reasonable diligence have been discovered before, but are discovered after the term at which the verdict or decision was rendered or made or report of the referee approved, or where the impossibility of making a case-made, without fault of the complaining party, arose after said term, the application may be made by petition filed in the original case, as in other cases, not later than the second term after such discovery or occurrence; on which a summons shall issue, be returnable and served, or publication made, as in the beginning of civil actions, or such service may be made on the attorney of record in the original case. . . ."

When the hearing came on before the trial court, the plaintiff objected to the jurisdiction of the court for consideration of the supplemental motion for new trial on the ground that the same was not filed in time. Pleasant v. Allen Bros., 180 Okla. 518, 71 P. 2d 114.

In this court, for the first time, the defendant asks consideration of his pleading, stating that in fact said supplemental motion for new trial was a petition for new trial. By reference to the record it appears that all parties at the time of hearing in the trial court acted upon said pleading as a supplemental motion for new trial. Had this matter been urged before the trial court and had the trial court considered the same as a petition for new trial and acted upon the same as such, the procedure would in all likelihood have been different from what the record shows herein, for the reason that the plaintiff, then being advised of the position taken by the defendant, could have produced his proof in opposition to the same. The court then could have considered all those matters in passing on this procedure. It would appear that a change of position in this court from the position of the parties in the trial court could easily work an injustice. The matter was heard as a motion for new trial, considered by the court, and that court's judgment on the matters as there presented does not appear to be any abuse of discretion.

The judgment is affirmed.

HURST, V.C.J., and RILEY, OSBORN, BAYLESS, WELCH, CORN, and DAVISON, JJ., concur.

GIBSON, C.J., having certified his disqualification to participate in the above decision, the Honorable KELLY BROWN was appointed to sit in the place of Chief Justice GIBSON.