**HAZELRIGG TRUCKING CO. v. DUVALL.**

No. 35189.

Supreme Court of Oklahoma.

June 23, 1953.

Rehearing Denied Sept. 15, 1953.

Application for Leave to File Second Petition for Rehearing Denied Sept. 29, 1953.

Welcome D. Pierson, Oklahoma City, W. B. Edwards, Seminole, for plaintiff in error.

Frank Seay, Seminole, for defendant in error.

CORN, Justice.

This action originally was commenced by Opal Lafever, for the benefit of herself and three minor children, to recover damages for the wrongful death of Virgil Lafever, husband and father, who was killed in a collision between his automobile and a truck operated by defendant's employee. Prior to trial C. S. Duvall was substituted as plaintiff by proper order made upon showing of his appointment as administrator of deceased's estate and as guardian of the minor children.

The petition charged defendant with negligence in; (1) operating the truck at night with glaring headlights, and failure to dim same in meeting deceased's car; (2) driving at an excessive rate of speed under conditions existing at the time; (3) driving to the left of center of the road when meeting another vehicle, in violation of the rules of the road; (4) operating the truck with a piece of iron pipe protruding some 3 to 4 feet from the left side of the truck and out over the highway, and without any warning signal thereon.

Defendant's second amended answer denied all allegations of negligence and alleged the truck was operated in a careful and prudent manner. Further, that the accident was proximately caused by the negligence and contributory negligence of plaintiff's decedent in; (a) driving at an excessive speed upon the wrong side of the highway in violation of the rules of the road, 69 O.S.1941 § 583; (b) driving while intoxicated and unfit to operate his automobile because not in possession of all his faculties; (c) that the accident was caused solely and proximately by the negligence, want of care and contributory negligence of decedent, and not from any act of negligence on the part of defendant's employee; (d) the accident was the result of unavoidable casualty and misfortune. Plaintiff replied by general denial of all defensive matters contained in defendant's answer.

All of the evidence, other than the fact of the accident, was in irreconcilable conflict. The record is voluminous and no attempt is made to render a complete narrative, but we set forth only that testimony bearing directly upon the issues as to the point of the collision and the question whether decedent was intoxicated.

The evidence at the trial reflected the following state of facts. Shortly after 8:30 p. m. on September 4, 1948, decedent left Tupelo to go to Coalgate, Oklahoma. He was driving a 1937 Plymouth sedan, and was accompanied by his father-in-law (Dame) and another passenger (Harmon). Traveling east on State Highway 3, a hard surfaced road, about two miles east of Tupelo he met defendant's oil field truck at a point where the road, which extends generally east and west, made a long "S" curve at the bottom of an incline. Dame was in the rear seat, the other passenger (Harmon) was asleep in the front seat. According to Dame's testimony decedent had slowed to about 25 miles per hour while in the curve. Coming out of the last part of this curve the bright lights from the truck struck them full in the face, and the truck driver ignored decedent's signal to dim the lights. Decedent pulled his car to the south edge of the road, but a collision

resulted and Lafever was killed. Dame testified the truck was about 3 feet south of the center line and traveling from 60–65 miles per hour at the time of collision, but he was rendered unconscious and had no recollection of events occurring after the accident. The evidence showed that following the accident the truck was parked about 100 feet west of the point of collision and on the north side of the road. The Plymouth was pointed approximately due north and nearly off the road, and there was glass, mud and debris on the road, most of this being on the north side of the pavement. A patrol officer, witness for defendant, determined the point of the collision by checking skid marks, and in his report estimated the truck's speed at from 30–40 miles per hour, the speed of decedent's car at 60 miles per hour, and the point of collision was 4 feet north of the center line of the pavement.

The deposition of a garage operator (Davis) who lived at Tupelo was offered in plaintiff's behalf. He arrived at the scene of the accident a few minutes after the accident. The truck was on the north side of the highway. An iron pole about 3 inches in diameter, was out of its rack and projected out at an angle from the truck bed some 2 feet or more with no flag or warning light thereon. Decedent's car was off the north shoulder of the road and the left side of the car was ripped out, as though torn out by this pole. Other witnesses also testified concerning the position of the vehicles after the collision; that the pipe or pole extended out from the truck; the position of deceased's car; presence of glass and debris upon the highway; and that deceased was lying in the middle of the highway with his head facing north.

Relative to the question of whether deceased was intoxicated, there was testimony from several witnesses who had conversed with him, or who had ample opportunity to observe him closely at different times during the day and up to a few minutes prior to his leaving Tupelo on the fatal journey to Coalgate. These witnesses testified positively that deceased was not intoxicated, and that he had drunk no intoxicants during the time they observed him. His presence in certain taverns was explained in that deceased was attempting to cash a check in order to pay a party for having driven him from Coalgate to Tupelo where his father-in-law (Dame) had possession of the car.

To the contrary upon this issue defendant offered the testimony of several witnesses, including the county sheriff and a tavern attendant, who had refused to cash deceased's check a short time prior to the accident. All of these witnesses likewise testified to having observed deceased at varying times, both while he had been in Coalgate, upon his return to Tupelo, and up until the time he entered his car to begin the return journey toward Coalgate, presumably to attend a dance in that vicinity. These witnesses were equally positive that their observation of deceased's demeanor and general conduct, during the times when each witness had occasion to note his condition, was sufficient to convince them he was intoxicated, or at least was drinking so heavily that he was not in a fit condition to operate an automobile.

Plaintiff also introduced the testimony of a civil engineer (James) concerning various maps, plats and scale drawings which he had made showing in detail the plan, profile, elevation and cross section of the highway both in the vicinity and at the place of the collision. As heretofore noted, the question concerning the point of the collision was a pivotal issue at the trial. The defense relied upon the theory that the physical facts, together with available testimony, clearly established that deceased drove across the center line of the highway and struck defendant's truck, despite the efforts of the driver to pull off the highway and avoid a collision. There was substantial testimony that, following the collision, dirt, glass and other debris was on the pavement on the north side of the center line of the highway. Such circumstances are relied upon by defendant as showing that deceased was on the wrong side on the road when the collision occurred; and, when considered in conjunction with evidence that the truck driver pulled to the

right and at least partially off the pavement in an effort to avoid deceased, clearly established defendant's defense.

Over defendant's strenuous objections plaintiff elicited further testimony from the civil engineer relative to such issue. The admission of this line of testimony is seriously urged as grounds for reversal of this judgment. The witness formerly had been an instructor in mathematics and physics and was permitted to testify as an expert concerning physical laws of inertia and centrifugal force. The witness testified that, because of the physical law of motion (inertia), an object continues to move in the same direction it was moving at the point of impact unless prevented from doing so by outside force. Under application of such rule witness was able to explain the presence of glass and debris from deceased's car to the north of the center of the highway. To explain such theory the witness produced a "homemade wheel, made very crudely" and, over defendant's objections demonstrated to the jury that when a moving object traveling in one direction came to a sudden stop any free material (in this case debris from deceased's car) thereon would continue to travel in the direction it was going at the point of impact.

Defendant's demurrer to plaintiff's evidence was overruled, as was the motion for a directed verdict at the close of all the evidence. Thereafter the court instruct the jury upon the law applicable to the issues presented. The jury returned a verdict for plaintiff for $79,375. Upon hearing of the motion for new trial the court ordered remittitur of the amount of the verdict in excess of $60,000, overruled the motion for new trial and entered judgment for this amount.

Four propositions are relied upon as grounds for reversal of this judgment. Defendant first contends the trial court committed reversible error in admitting the expert testimony concerning the direction in which debris would be cast from the point of collision, and in permitting the witness to demonstrate such theory by means of the device used. Defendant calls attention to our decisions defining an expert, as well as

cases holding that expert testimony is admissible only when the subject matter is not within the common knowledge and understanding of mankind, and not when the subject matter is something upon which the jury is as competent to understand and determine as the witness would be. See Oklahoma Natural Gas Corp. v. Schwartz, 146 Okl. 250, 293 P. 1087; Rodgers, Adm'x v. Oklahoma Wheat Pool Terminal Corporation, 186 Okl. 171, 96 P.2d 1040. And, that it is error to permit a witness to invade the province of the jury by expressing an opinion upon the ultimate fact in issue, unless coming within the exception making expert testimony admissible. Fidelity-Phenix Fire Ins. So. v. Board of Education, Town of Rosedale, 201 Okl. 250, 204 P.2d 982.

The gist of defendant's argument is that the ultimate fact for the jury's determination was the exact point where the collision occurred, that despite the invariability of the laws of physics, application thereof is subject to indefinite variations; if left alone the jury would have determined that because the debris was on the north side of the road the collision occurred there, and there was no need for expert testimony concerning a subject upon which the jury was as well informed as the expert. To support this argument relies upon Skulimowski v. Deahl & Deahl, 169 Ill.App. 355; Hamre v. Conger, 357 Mo. 497, 209 S.W.2d 242; Massey v. Ivester, 168 Okl. 464, 33 P.2d 765.

It is unnecessary either to consider at length the argument urged upon this point, or to pass upon the question of the propriety of permitting this line of testimony. The witness testified to matters within the common knowledge and understanding of the average juror. There was evidence that the collision occurred on the curve which the jury could consider in determining the point where the collision occurred. Under such circumstances the admission of the questioned testimony was cumulative and harmless, if error, since we perceive no grounds for asserting that prejudice, or a miscarriage of justice resulted therefrom. Goodall v. City of Clinton, 196 Okl. 10, 161 P.2d 1011; Auten v.

Livingston, 201 Okl. 467, 207 P.2d 256; Haggard v. Oklahoma City, 203 Okl. 76, 218 P.2d 366.

■ Defendant next contends the verdict of the jury is not supported by the evidence and is contrary to law. While recognizing the principle that a jury verdict supported by any competent evidence is not to be disturbed except in exceptional circumstances, defendant relies upon pronouncements in our earlier decisions as a basis for the argument that a jury verdict should be reversed where flagrantly contrary to the evidence, and where a great injustice has been done. See Modern Woodmen of America v. Michelin, 101 Okl. 217, 225 P. 163, 36 A.L.R. 971; Shuler v. Viger, 123 Okl. 110, 252 P. 18; 5 C.J.S., Appeal & Error, § 1648(b). An extensive resume of the evidence is offered in an effort to show that the verdict is contrary to the law and the evidence.

■ We decline to discuss the numerous interpretations sought to be placed upon the evidence to support this argument, or to comment upon the weight thereof. Even should it be admitted that plaintiff's evidence was inconsistent in some respects, there is testimony which, if taken as true, supported the jury's finding that the collision would not have occurred but for the truck driver's negligence. It is not the function of this court to weigh conflicting testimony. Such function was for the jury and their finding thereon is conclusive upon us when supported by competent evidence. Sebranek v. Krivohlavek, 196 Okl. 132, 163 P.2d 530; Chapman v. Koenig, 205 Okl. 402, 238 P.2d 357; Harmon v. Metcalfe, 204 Okl. 79, 226 P.2d 979.

The third contention is that the verdict, reduced by remittitur to $60,000 clearly is excessive and not sustained by the evidence, and is contrary to law. The evidence disclosed deceased had a life expectancy of 31.75 years. The testimony tending to establish earning capacity showed deceased had earned as high as $3,000 per year. At the time of his death he was a tenant farmer and trader and, although the evidence, introduced to establish earning capacity was, according to the trial court, a

little weak, there was no evidence by defendant controverting this testimony in any respect. These matters were noted by the trial court in ordering a remittitur.

Defendant urges that the verdict undoubtedly resulted from passion and prejudice, and that the court evidently believed the verdict resulted therefrom since he ordered approximately 25% thereof remitted, it necessarily follows that the passion and prejudice affected the entire verdict causing the jury to find for plaintiff where otherwise the jury would have found for defendant. Both parties present extensive lists of authorities, which are reviewed in support of their respective positions. coupled with such citations is considerable argument relative to the present value of the dollar. Defendant reviews numerous cases from this court over the years, and points out that the present verdict is greatly in excess of any death action ever affirmed by this court.

■ It is of no value to review great numbers of cases wherein jury verdicts for damages for wrongful death have been affirmed, affirmed upon condition of remittitur, or set aside as excessive. It is everywhere recognized that in recent years courts generally, in passing upon the excessiveness or inadequacy of verdicts for damages, have given greater consideration to increased living costs and the impaired purchasing power of the dollar. See Am.Jur. Damages, Sec. 204. Such matters have been the subject of consideration by our court in passing upon the alleged excessiveness of a verdict for damages. In the recent case of Jordan Bus Co. v. Garnand, 203 Okl. 623, 225 P.2d 173, it was noted that the present tendency is to allow larger verdicts than those formerly permitted to stand. The verdict in this case was within the limits reflected by the uncontroverted evidence. In view of the record we are unable to say that the amount of this verdict, although large as it is, can be said to be excessive and to have been the result of passion and prejudice so as to justify granting a new trial.

Defendant finally contends the judgment should be reversed because of misconduct

of plaintiff's counsel in making an impassioned plea to the jury, which was not justified by the evidence but was intended merely to arouse bias and prejudice against defendant in the minds of the jury.

The closing arguments of counsel appear in this record, and reflect that the case was strenuously contested and most certainly not without some recrimination apparent on both sides. During closing argument of plaintiff's counsel strenuous objections were interposed to portions of the argument on the grounds such argument was outside the issues and calculated to sway the jury's sympathy and prejudice the defendant. The argument objected to principally was the comments of plaintiff's counsel concerning the probable destitute condition of deceased's family. All such argument was objected to by defendant's counsel who, when the jury retired, requested the trial court to advise the jury not to consider this sympathetic appeal. The court pointed out to counsel that a specific instruction had been given advising the jury that sympathy, passion nor prejudice could play no part in their reaching a verdict.

Defendant relies upon the rule announced in such cases as City of Shawnee v. Sparks, 26 Okl. 665, 110 P. 884, L.R.A.1918D, 1; City of Bristow v. Pinkley, 158 Okl. 104, 12 P.2d 229, which held, in effect, that argument of counsel calculated to prejudice the minds of the jury, and not warranted by the testimony, goes beyond the freedom of discussion which is to be allowed and may be considered as having prevented a fair and impartial trial so as to require reversal of any judgment rendered.

It is to be expected that in the heated contest of any lawsuit the natural zeal of counsel in presentation of his case may lead to indulging in rhetorical flights, or the making of too violent deductions which are neither fully borne out by the testimony nor wholly necessary to legitimate discussion of the issues. Although not condoning arguments or conduct which obviously transgress professional ethics in an effort to play upon sympathy of a jury or induce a feeling of prejudice against one party, it must be recognized that different counsel perform in very different manner. Conduct of counsel is a matter to be left largely within the discretion of the trial judge. Assuming that the argument objected to by defendant presented deductions not justified by the record, the jury specifically was admonished not to consider such matters. It is presumed the jury followed the trial court's instructions. For this reason we are unable to say that defendant did not have a fair trial, or that the alleged misconduct of counsel in his argument to the jury was such as to require reversal of the judgment rendered. Safeway Stores, Inc. v. Whitehead, 190 Okl. 464, 125 P.2d 194; Mid-Continent Petroleum Corp. v. Jamison, Adm'r., 197 Okl. 387, 171 P.2d 976.

Judgment affirmed.

JOHNSON, V. C. J., and WELCH, ARNOLD and BLACKBIRD, JJ., concur.

HALLEY, C. J., and O'NEAL and WILLIAMS, JJ., dissent.

HALLEY, Chief Justice (dissenting).

Virgil Lafever was killed in a collision between an automobile driven by himself and a truck belonging to the defendant. There was one witness who testified for the plaintiff who claimed he saw the accident. He was riding in the back seat of the automobile and was the father-in-law of the deceased Lafever. A man by the name of Harmon was riding in the front seat with Lafever, but he did not testify. The father-in-law testified that the collision occurred on the south side of the road, the automobile side. The driver of the truck testified the collision occurred on the north side. All physical evidence in the way of debris and the location of the truck and automobile after they came to rest indicated it was on the north side. There was testimony by substantial witnesses that the deceased Lafever was under the influence of intoxicating liquor a short time before the accident. There was also evidence to the contrary. There was sufficient evidence to necessitate the submission of the case to the jury, but I think

the trial court erred in not granting a new trial for three reasons. The first reason is that it was error to permit the so-called expert, W. L. James, to testify as to how the debris got on the north side of the road. I think that the reasoning on this point in Hamre v. Conger, 357 Mo. 497, 209 S.W.2d 242, is so sound that it should be followed in this case. The crude wheel that was used by the witness and his testimony based on conjecture were bound to mislead the jury.

There was no propriety in permitting the corroboration of the father-in-law when he testified the accident happened on the south side of the road. The fact that he admitted that most of the debris was on the north side of the road did not make the expert testimony admissible.

The second reason that this case should be reversed is that plaintiff's counsel made improper statements in closing argument which from the size of the verdict unquestionably influenced the jury. I submit that the following statements made by counsel for plaintiff constitute reversible error:

"You know, it is unpleasant, it's awfully hard to talk about hunger and poverty. It's a difficult thing to think about; little barefoot children when there is frost on the ground. It's hard to think about little blue bodies caused by lack of clothing when the north wind blows. It's unpleasant to think about widows and orphans wearing cast off rags from the neighbors. It's hard to think about a fevered brow that has to be treated as a charity patient. Gentlemen, about two weeks from now in a little cross-roads country town, if Mr. Pierson and Mr. Edwards have their way, there will be a small boy pressing a little face against the showcase of a show window on the street * * *"

"By Mr. Seay: I would like to know if counsel is going to continue interrupting me. He has had his say, he's had forty minutes. I hope he doesn't interrupt again.—

"Then, there might be in that window that Mr. Pierson objects to, a little pair of cowboy boots, and when he turns his face away he looks back over his shoulder again and wonders. The world passes him by. He's just an orphan. He will wonder why he can't have things like kids that have a daddy."

"By Mr. Seay: Thank you sir.— And when those two little orphan girls and their mother bow their heads in prayer on the day when the Christian world celebrates the birth of the Christ child, they will not thank God for a bountiful supply of food on the table; they will ask God that they be permitted to live, because the table may be bare." (CM—358-360)

That argument unduly appeals to the sympathetic nature of the average juror and should not be made. In 53 Am.Jur.Trial, Sec. 496, this statement is made:

"While sympathy for suffering and indignation at wrong are worthy sentiments, they are not safe visitors to the courtroom. They may not enter the jury box, nor be heard on the witness stand, nor speak too loudly through the voice of counsel. It is, therefore, improper for counsel to appeal to the sympathy of the jury, either directly or indirectly, as, for example, by asking the jury, in a personal injury action, to put themselves in the plaintiff's place, if they would go through life in the condition of the injured plaintiff, or would want members of their family to go through life crippled. In a few cases, counsel arguing to juries have attempted to invoke sympathy by speaking, without justification in the evidence, either eulogistically or disparagingly of third persons who may have been casually connected with the case or the parties to the controversy. This conduct is always improper."

We held that it was improper to argue that a corporation could have no sympathy as it stressed things that were not a proper element of damage. Green Construc-

tion Company v. Lampe, 174 Okl. 351, 50 P.2d 286.

In my opinion this argument was responsible both for the verdict for plaintiff and the amount of the verdict.

The third reason this case should be reversed is that the size of the verdict shows that it was not rendered by a fair and impartial jury. The jury's verdict was for $79,375. There was no evidence to justify such a verdict. The most the deceased ever made was $3,000 a year. He was a tenant farmer and laborer. There was some evidence that he traded in stock but this was very sketchy. He could not read and write. He was thirty-seven years old and at the peak of his earnings in the type of work he was equipped to do.

I have been unable to find any case where the maximum income of the deceased was $3,000 dollars annually that a recovery of almost $2,000 a year for the life expectancy was allowed. The value of the dollar does not enter in so much in a case of this kind, but it is what the deceased would have made and what part of his earnings would have gone to the wife and children.

I think that the verdict is so patently the result of bias and prejudice that the case should be re-tried.

I dissent.